## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA, )
                                         )
               Plaintiff, )
                                           )     No.:  CR 04-29 (JRT/FLN)
                  v. )
                                           )
MOHAMMED ABDULLAH WARSAME, )
                                           )
              Defendant. )

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO DISMISS COUNTS 1 AND 2 OF SUPERSEDING INDICMENT

**I.**       **§2339B is Vague and Overly Broad in Violation of the First Amendment Rights to Freedom of Association and Expression Because It Fails to Require Sufficient Knowledge and Criminal Intent.**

Under the plain language §2339B, "knowingly" refers only to the providing of material support, and the statute does not require that the provider of such support know that the organization has been designated as a "foreign terrorist organization" (hereinafter "FTO"), or that the organization engages in terrorist activities, or that the material support be provided with the specific intent to further the illegal activities of the organization. The United States Government under the present administration has consistently taken this view of the statute's requirements. *See e.g., United  States v. Al-Arian*, (Al-Arian I), 308 F. Supp. 2d 1322 (M.D. Fla., 2004);*United States v. Al-Arian*,

1

(Al-Arian II), 329 F. Supp. 2d 1294 (M.D. Fla. 2004); *United States v. Sattar*, 348 F. Supp.2d 348, 356 (S.D.N.Y. 2002).

"The doctrine of overbreadth applies when a statute lends itself to a substantial number of impermissible applications, such that it is capable of deterring protected conduct, when the area affected by the challenged law substantially involves first amendment interests and when there is no valid construction which avoids abridgment of first amendment rights." *United States v. Dellinger*, 472 F.2d 340, 358 (7th Cir.1972). Similarly, "[i]f the line drawn by decree between permitted and prohibited activities . . . is an ambiguous one, we will not presume that the statute curtails constitutionally protected activity as little as possible. For standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432 (1963).

These principles of overbreadth and vagueness are closely intertwined, "since a vague statute permits overly broad application to protected activity." *Dellinger at 358*. Overbreadth and vagueness are "logically related and similar doctrines," and facial vagueness and overbreadth apply when free speech and association are impermissibly affected. *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). A court can invalidate a statute even if it has some valid applications, if the statute reaches a substantial amount of constitutionally protected conduct and fails to provide either actual notice or is not sufficiently narrow and specific to prevent discriminatory or arbitrary enforcement. *See Kolender*, 461 U.S. at 357-58. *See also*, *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999); *Horton v, City of St. Augustine*, 272 F.3d 1318, 1330 (11th Cir 2001);.*United*

2

*States v. Rahman*, 189 F.3d 88, 116 (2d Cir. 1999); *Al-Arian* II, 329 F. Supp. 2d at 1301-04.

The material support statute lacks sufficient clarity that would allow persons of "ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The statute fails to give sufficient notice of the "forbidden conduct and set boundaries to prosecutorial discretion." *United States v. Handakas*, 286 F.3d 92, 101 (2d Cir. 2002)

As the Court of Appeals stated in *United States v. Dellinger,* in reversing the convictions in the infamous Chicago conspiracy trial in which the defendants were convicted under the federal Anti-riot Act:

> Where statutes clearly warn that constitutionally protected expressive activity *will be*, or even with some degree of vagueness, warn that such activity *may be* penalized, the courts have recognized a "chilling effect" or deterrence of protected expression which requires more drastic judicial treatment of the statute. While this same deterrence from unpunishable conduct likely occurs from an overly broad statute dealing with any type of conduct, the high value attached to uninhibited expression, and the acknowledgment of its sensitive nature, have produced exceptions to the usual judicial attitude toward statutes questioned on constitutional grounds.

*Dellinger, 472 U.S.* at 356-57.

The provisions of 2339B allow for severe criminal penalties for someone who innocently (without intent to further any illegal acts) donated money or gave "expert advice" to an FTO, even in the absence of knowledge by the donor that the recipient

organization had been designated as an FTO or had engaged in the past in terrorist conduct.  Under such a sweeping scope of potential criminality, a broad array of protected First Amendment rights of association and/or expression can be punished or improperly deterred.

The Supreme Court has repeatedly recognized that the act of contributing money to an organization implicates the First Amendment right of freedom of association. See, *e.g.*, *McConnel v. Federal Election Commission*, 540 U.S. 93 (2003); *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000); *Buckley v. Valeo*, 424 U.S. 1 (1976) In *Buckley* the Court stated that, "the constitutionality [of a statute regulating political donations] turns on whether the government interests advanced in its support satisfy the *exacting scrutiny* to limitations on core First Amendment rights of political expression." *Id*. at 44-45. (emphasis in original). Even the indirect regulation of a person's associational rights has been held to have the "practical reality" of impermissibly infringing on the right of freedom of association. *See, Healy v. James*, 408 U.S. 169, 182-83 (1972) ("the Court has consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization").

While recognizing that limitations on political contributions may be permissible, such limitations must be "closely drawn" to further a sufficiently important government interest. See, *e.g., McConnel*, 540 U.S. at 134.  While here of course, the government's interest in curtailing material support for an FTO is an important government interest, the

4

statute is not closely drawn, but rather takes a shotgun approach which threatens to severely criminalize a broad range of First Amendment conduct. See, *e.g.*, *Al-Arian I,* 308 F. Supp 2d at 1337-38.  The statute's failure to provide reasonable notice of the prohibited conduct and the obvious potential for politically motivated discriminatory enforcement impermissibly punishes and chills the exercise of freedom of association..

In determining the constitutionality of  a statute that so clearly impinges on the exercise of First Amendment rights and is not content neutral, this Court should apply the "strict scrutiny" standard, requiring that the State show a compelling governmental interest which is implemented with the least restrictive means - a test under which the statute clearly fails to pass constitutional muster.  The statute is not content neutral as it discriminates on the basis of the content of one's political associations. It is not illegal to donate money or other assistance- for example, to the Irish Republican Army, the Northern Alliance, or any of the other hundreds of organizations worldwide who are not designated despite their use of violence, -  while the same support if offered to a group the Secretary of State has blacklisted is severely criminalized.  This is clearly content-based discrimination, analogous to a campaign finance law that would restrict contributions only to particular political parties selected by the incumbent government.

Even assuming *arguendo* that the statute is unrelated to the suppression of speech or association, is content neutral, and the "intermediate scrutiny" standard is applied,  the "incidental" restrictions on the First Amendment freedoms must still be "no greater than necessary." *United States v. O'Brien,* 391 U.S. 367, 376-77 (1968).  The statute's failure

to require that the material support be given to an organization <u>known</u> to be a designated FTO or an organization <u>known</u> to be involved in terrorist activity, for the purpose of furthering the <u>illegal</u> aims of such an organization, casts a net far greater than necessary.

When a statute "taken as a whole, is substantially overbroad judged in relation to its plainly legitimate sweep, it must be held unconstitutional." *Virginia v. Hicks*, 539 U.S. 113 (2003). In *Aptheker v. Secretary of State*, 378 U.S. 500, 514 (1964), the Court held unconstitutional on its face a law that prohibited Communist Party members from obtaining passports, finding that the law swept too widely and "is patently not a regulation narrowly drawn to prevent the supposed evil."

There is no indication in the language or legislative history of 2339B that the Congress intended to impose strict liability on anyone who donated material support to a designated organization. The statute on its face, however, allows for such a broad sweep, and in so doing potentially criminalizes such a broad spectrum of First Amendment activity that it must be struck down.

II.      **§2339B Violates the Fifth Amendment Right to Due Process Because It Allows For Criminal Liability in the Absence of Proof of Personal Guilt.**

In *Scales v. United States*, 367 U.S. 203 (1961), the Supreme Court analyzed the constitutionality of the membership clause in the Smith Act which made it unlawful to be a knowing member in any organization that advocated the violent overthrow of the United States government. In recognizing that organizations -in that case the U.S. communist party - may embrace both legal and illegal aims, the *Scales* Court found that,

in order to save the Smith Act from functioning as an unconstitutional infringement on

freedom of expression and association, it had to read a "specific intent" requirement to

further the illegal aims of the organization into the statute:

> In our jurisprudence guilt is personal, and when imposition of
> punishment on a status [*i.e.,* membership] or on conduct
> [money donations] can only be justified by reference to the
> relationship of that status or conduct to other concededly
> criminal activity . . . that relationship must be sufficiently
> substantial to satisfy the concept of personal guilt in order to
> withstand attack under the Due Process Clause of the Fifth
> Amendment.

*Id.* at 224-25.

In *Scales* the Court went on to explain:

> [Constitutional scrutiny is satisfied] when [a] statute is found
> to reach only 'active' members having also guilty knowledge
> and intent, and which therefore prevents a conviction on what
> otherwise might be regarded as merely an expression of
> sympathy with the alleged criminal enterprise,
> unaccompanied by any significant action in its support or any
> commitment to undertake such action.

*Id.* at 228.

The personal guilt/specific intent requirement expressed in *Scales* and its progeny

is a bedrock of our criminal justice system.  It is required where criminal responsibility is

based on connection to the illegal actions of others:

> The contention that an injury can amount to a crime only
> when inflicted by intention is no provisional or transient
> notion. It is universal and persistent in mature systems of law
> as belief in freedom of the human will and consequent ability
> and duty of the moral individual to choose between good and
> evil.

*Morissette v. United States*, 342 U.S. 246, 250 (1952).

This first principle of our jurisprudence apples to crimes of conspiracy, aiding and abetting, and enterprise liability under RICO and requires:

> a community of illicit intent between the individual held responsible for the criminal acts of others, and the actual perpetrators of those crimes. *That shared purpose to achieve jointly held illegal aims* is the common thread among the diverse doctrines of vicarious criminal responsibility.

*Ferguson v. Estelle*, 718 F.2d 730, 735-36 (5th Cir. 1983). (emphasis added).

In interpreting anti-gang statutes, aiding and abetting statutes, loitering laws, anti-riot acts, RICO, and money laundering provisions, courts have consistently stressed the critical requirement of intent to further illegal activity, and have either interpreted the laws to require such a specific intent showing, or have invalidated laws that could not be so interpreted. See, *e.g.*, *McCoy v. Stewart*, 282 F.3d 626, 631 (9th Cir. 2002) (defendant could not be punished under anti-gang law absent evidence of intent to incite illegal activity); *United States v. Kaufmann*, 985 F.2d 884, 896 (7th Cir 1993) (upholding money laundering statute against due process challenge because it requires proof of specific intent to conceal or disguise nature or location of property believed to be proceeds of unlawful activity); *United States v. Elliot*, 571 F.2d 880, 903 (5th Cir. 1978) (holding RICO is consistent with due process requirement of personal guilt).

Specifically pertinent to these principles is the recent opinion by the Seventh Circuit in *Boim* v. *Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2001), in which the

Court of Appeals found that the corollary civil statute to the criminal material support statute at issue here required a showing of specific intent to further the illegal aims of the "terrorist organization" before liability could be imposed:

> We have no quarrel with that general proposition [a blanket prohibition of association with a group having both legal and illegal aims presents a real danger that legitimate political expression or association would be impaired] or its corollary, that in order to impose liability on an individual for association with a group, it is necessary to establish that the group possessed unlawful goals and *the individual had the specific intent to further those illegal aims*.

*Id.* at 1022. (emphasis added).

In the indictment here, the statute allows for the criminalizing of any material support to al-Qaeda regardless of Mr. Warsame's knowledge that al-Qaeda has been designated as an FTO, that it engages in terrorist acts, or that the support was given with the specific intent to further the illegal activities of al-Qaeda, which engages in legal activities.

Given the definition in *Scales*, al-Qaeda is a "bifarious" organization:

> It is of course true that quasi-political parties or other groups that may embrace both legal and illegal aims differ from a technical conspiracy, which is defined by its criminal purpose, so that all knowing association with the conspiracy is a proper subject for criminal proscription as far as First Amendment liberties are concerned.  If there were a similar blanket prohibition of association with a group having both legal and illegal aims, there would indeed be a real danger that legitimate political expression or association would be impaired, but the membership clause as here construed [to include a specific intent requirement], does not cut deeper

9

> into freedom of association than is necessary to deal with the
> substantive evil that Congress has the right to prevent.

367 U.S. at 229.

In the absence of specific intent requirements that Mr. Warsame knew that al-Qaeda was a designated FTO or engaged in terrorist activities, and that the money or other support provided was given with the specific intent to further its illegal activities, the statute criminalizes a limitless range of innocent and protected activity. See e.g., *Al-Arian I*, 308 F. Supp. 2d at 1337-38. Even the determination of who constitutes al-Qaeda is extremely vague and speculative. Al-Qaeda is a political movement; there are no membership cards, no enrollment lists, and no specific immutable indicia of membership. There is no objective method to determine if a person is a affiliated or associated with al-Qaeda, or simply involved with one of the myriad of social-welfare or educational programs believed to be loosely affiliated with al-Qaeda. Anyone who is actually a part of the military activities of al-Qaeda no doubt keeps such involvement quite secret.

Nor does the designation by the Secretary of State provide a definition. Is it referring solely to the military activities of al-Qaeda, or does it encompass legal activities carried out by social-welfare, educational and election groups that are sympathetic to al-Qaeda or its ideology? Similarly, is money given to help the family of a prisoner who is accused of being associated with al-Qaeda, or holding a forum for a speaker who espouses views similar to al-Qaeda, or passing out literature that contains views

attributed to al-Qaeda, illegal under the statute? The possibilities of criminalizing

protected activity in the absence of personal guilt are endless, and such a statute devoid of

criminal intent in the shadow of the First Amendment cannot be upheld as constitutional.

As the Seventh Circuit stated in *Boim, supra*:

> [The] right to "associate does not lose all constitutional
> protection merely because some members of the group may
> have participated in conduct or advanced doctrine that itself is
> not protected."

291 F.3d at 1023.

See also, *NOW v. Scheidler*, 267 F.3d 687, 704 (7th Cir. 2000) (to obtain civil liability

under RICO plaintiff must show that defendant held a specific intent to further illegal

aims of organization).

If a specific intent to further illegal activity is required to impose civil liability, it

necessarily follows that the same state of mind is required to impose very serious

criminal penalties. Yet §2339B contains no such requirement. Under the plain language

of the statute, a person donating money to an FTO, but who has no intent to further its

illegal activities, is criminally responsible even in the absence of personal guilt. Such a

statute violates the principles of *Scales* and its progeny, and is therefore unconstitutional.

**III.**    **<u>8 U.S.C. §1189, Which Empowers the Secretary of State to Designate a
Foreign Organization as an FTO, Is Lacking in Minimal Due Process Safeguards So
That It Is Unconstitutional on Its Face, and the Statute's Provision Making Such
Designation Binding and Not Subject to Challenge in a 2339B Criminal Prosecution
Violates Due Process, Freedom of Association, and the Right to a Jury Trial</u>.**

**<u>Introduction</u>**

The Antiterrorism and Effective Death Penalty Act of 1966 ("AEDPA"), which prohibits persons from knowingly providing material support or resources to an FTO, authorizes the Secretary of State to designate an organization as a "foreign terrorist organization," pursuant to 8 U.S.C. 1189. In making such a designation, the Secretary of State must creat an administrative record and may consider classified information. 8 U.S.C. §1189(a)(3). The classified information is not to be disclosed except to the reviewing court *ex parte* and *in camera. Id.*

An organization is not given notice of an impending designation, nor a hearing or other opportunity to present any information, before a designation is made. The classification lasts for two years and a group can be redesignated a foreign terrorist organization for subsequent two year terms without limitation on the number of possible designations.

A designated organization may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit within 30 days after the designation is published in the Federal Register. 8 U.S.C. 1189(b)(1). The reviewing court is limited to the administrative record and any classified information which is submitted by the government *ex parte* and reviewed *in camera*. While the designated organization is allowed this extremely limited review, a person charged under 18 U.S.C. §2339B is prohibited from challenging the legality of the designation on appeal to the D.C. Circuit, or in his defense in a criminal prosecution. 8 U.S.C. §1189(a)(8) (once the designation has become effective, "a defendant in a criminal action shall not be permitted

to raise any question concerning the validity of the issuance of such designation as a
defense or an objection at any trial or hearing.")

>  **A.  The administrative procedures which result in the
> FTO designation under 8 U.S.C. §1189 lack
> fundamental due process safeguards and
> meaningful judicial review, rendering it
> unconstitutional on its face, and this court has the
> authority and obligation to invalidate the statute.**

The designation statute does not provide notice to an organization that a
designation is being considered by the government, allows no hearing prior to the
designation, and no opportunity to review the administrative record or supplement it with
information to contradict the designation. In *National Council of Resistance of Iran*
*("NCRI") v. Department of State*, 251 F.3d 192, 205 (D.C. Cir. 2001), the D.C. Circuit
found that the failure to provide the plaintiff organization notice and hearing prior to
designation violated the organization's right to due process[a]:

> [T]he fundamental norm of the due process clause
> jurisprudence requires that before the government can
> constitutionally deprive a person of the protected liberty or
> property interest, it must afford him notice and hearing.

---

[a] Because the designation would expire in four months, the court stated that it was not
vacating the designation but would "remand the questions to the Secretary with
instructions that the petitioners be afforded the opportunity to file responses to the non-
classified evidence against them, to file evidence in support of their allegations that they
are not terrorist organizations, and that they be afforded an opportunity to be
meaningfully heard by the Secretary upon the relevant findings." 251 F.3c at 209.

The Court in *NCRI* found that although the statute provides for judicial review *after* a designation, such review was insufficient in the face of no notice and hearing prior to the designation. The Court emphasized that:

> The unique feature of this statutory procedure is the dearth of procedural participation and protection afforded the designated entity. At no point in the proceedings establishing the administrative record is the alleged terrorist organization afforded notice of the materials used against it, or a right to comment on such materials or the developing administrative record. Nothing in the statute forbids the use of "third-hand accounts, press stories, material on the Internet or other hearsay regarding the organization's activities…." *Id.* at 19 [quoting People's Mojahedin Organization of Iran ("PMOI") 182 F.3d 17 (D.C. Cir. 1999] The Secretary may base the findings on classified material to which the organization has no access at any point during or after the proceeding to designate it as terrorist.

*Id.* at 196.

In its earlier decision involving the same designated organizations, the D.C. Circuit also raised harsh criticisms of the designation statute's lack of due process:

> But unlike the run-of-the-mill administrative proceeding, here there is no adversary hearing, no presentation of what courts and agencies think of as evidence, no advance notice to the entity affected by the Secretary's internal deliberations . . . Because nothing in the legislation restricts the Secretary from acting on the basis of third hand accounts, press stories, material on the Internet or other hearsay regarding the organizations activities, the 'administrative record may consist of little else. . . At this point in a judicial opinion, appellate courts often lay out the 'facts.' We will not, cannot do so in these cases. What follows in the next two subsections is certainly not evidence of the sort that would normally be received in court. It is instead material the Secretary of State complied as record, from sources named and unnamed, the accuracy of which we have no way of evaluating.

*People's Mojahedin Organization of Iran v. Department of State* ("PMOI" ), 182 F.3d 17, 19 (D.C. Cir 1999).

Given the complete absence in the statute of minimal due process safeguards and the meaninglessness of the judicial review, the statute on its face violates due process and should be held to be unconstitutional.  Although Section 1189 purports to limit judicial review of an FTO designation by the Secretary of State to the D.C. Circuit, the language of the statute does not specifically limit such review to the D.C. Circuit only. Before a statute will be construed to restrict access to judicial review, there must be clear and convincing evidence of Congressional intent to impose such restriction. *Johnson v. Robison*,  415 U.S. 31, 373-74 (1973).

More to the point, however, there is nothing in the statute or in the general principles of constitutional law which prohibits this Court from reviewing a due process challenge to the constitutionality of statute under which a criminal defendant before it is being prosecuted.   In *United States v. Rahmani*, 209 F. Supp 2d 1045 (C.D. Cal. 2002), rev'd on other grounds, *United States v. Afshari*, 392 F.3d 1031 (9th Cir., 2004) (petition for rehearing *en banc* pending)  the trial court held that it had a constitutional obligation to review a statute under which a criminal defendant before it was being prosecuted:

> I am duty bound to pass on Section 1189's constitutionality.
> This court understands its oath to uphold the Constitution and
> apply only those laws made in conformance to, and pursuance
> of, the Constitution. I will not abdicate this duty and allow
> this criminal case to proceed if the evidence indicates that one

15

element of the offense (the foreign terrorist designation) was
procured in violation of the Constitution

209 F.Supp.2d at 1053.

The Court in *Rahmani* went on to state:

> As a district judge I am duty bound to scrutinize the laws
> applied in my court for conformance with the Constitution
> lest I apply an unconstitutional law. See *Marbury v. Madison*,
> 5 U.S. 137, 177, 2 L.Ed. 60 (1803) (citations omitted).
> The instant Section 2339B prosecution relies upon a
> designation obtained in violation of due process. I will not
> abdicate my responsibilities as a district judge and turn a
> blind eye to the constitutional infirmities of Section 1189
> when it supplies a necessary predicate to the charged offense.
> Moreover, my duty to review a statute for constitutionality is
> of the greatest import where, as here, defendants stand to
> suffer criminal penalties through the operation of such statute.

*Id.* at 1054.

This Court has the same constitutional obligation to determine if the statute upon

which the predicate FTO designation was made is constitutional. Since Section 1189 by

its express terms provides the designated organization with no notice and no opportunity

to object to the administrative record or supplement it with information to contradict the

designation, and since the record can consist of *ex parte* and *in camera* classified

materials, as well as hearsay newspaper and other third hand accounts, the statute violates

due process and should be struck down as unconstitutional.

> **B.    Mr. Warsame has the right to challenge an**
> **administrative determination which is a predicate**
> **finding to criminal charges before this court, and**
> **the statute's prohibition against such challenge is**
> **unconstitutional.**

16

While the procedures outlined in 8 U.S.C. §1189 may arguably be sufficient to block an organization's bank accounts or property, or bar its members from being admitted to the United States, such procedures are a far cry from due process when the concern is a person's liberty in a criminal case. The defense is not challenging the right of the Secretary of State, pursuant to a law of Congress, to designate an organization a FTO for the purpose of civil proceedings against the organization or its property, nor is the defense raising a challenge to a review of such determination being centralized in the D.C. Circuit for purposes of uniformity and economy of resources. What Mr. Warsame challenges is the use of such designation, which is made without minimal due process protections including a total denial of a defendant's right to judicial review of such designation, as a predicate finding in a criminal case in which he faces possible life in prison. To allow such a critical administrative finding to be placed before the jury in this case, despite the total lack of due process in reaching this result, grossly violates Mr. Warsame's rights to due process, trial by jury and the right to a fair trial.

A series of Supreme Court cases clearly provide for the right of review in a criminal case of an administrative action that establishes an element of a criminal offense, even though Congress had not authorized such review. In *Estep v. United States*, 327 U.S. 114 (1946), the defendant was convicted of violating the Selective Service Act based on a final decision by a local draft board which did not permit judicial review. The Supreme Court nonetheless held that a defendant was entitled to review in the criminal case whether there was a basis in fact for the administrative action.

17

Similarly, in *Adamo v. United States*, 434 U.S. 275 (1978), in which the defendant was charged with violating emission standards under regulations promulgated by the EPA and the statute limited judicial review to only the D.C. Circuit within 30 days of their promulgation, the Supreme Court held that the accused was entitled nonetheless to judicial review of the administrative action in the criminal case.

In *Touby v. United States*, 500 U.S. 160 (1991), the statute in question allowed for judicial review of the permanent scheduling of a controlled substance by the Attorney General, but not judicial review for the temporary scheduling of such substance. Despite the explicit prohibition of judicial review in the statute, the Supreme Court held that the temporary classification was subject to judicial review in the criminal case. "[The prohibition on judicial review] does not preclude an individual from bringing a challenge to a temporary scheduling order as a defense to a prosecution…." *Id.* at 165  In his concurring opinion Justice Marshall pointed out the fundamental rights implicated for a criminal defendant:

> Because of the severe impact of criminal laws on individual liberty, I believe that an opportunity to challenge a delegated lawmaker's compliance with congressional directives is a constitutional necessity when administrative standards are enforced by criminal law.

*Id.* at 169-70 (Marshall, J., concurring).

Similarly, in *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987) the defendants were indicted for felony reentering the country after having been deported. The criminal

trial court refused to allow a challenge to the administrative deportation order. On appeal the Supreme Court reversed, holding that the statutory scheme which prohibited judicial review of the administrative action was unconstitutional.  The Supreme Court found that the offenses could not be based merely on the fact that a deportation had been ordered, but that the proceeding that ordered the deportation had to have complied with due process. "Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding…." *Id.* at 837 (emphasis in original).

Here, as in *Mendoza-Lopez* and the other cases cited above, the issue is not simply whether al-Qaeda has been designated as an FTO, but whether such designation comported with due process. In all of these cases, the Supreme Court found that the accused was entitled to challenge on due process grounds an essential element in the criminal charges decided by administrative determination when the accused had no prior right of judicial review.

Further, the recent opinion by the Ninth Circuit in *United States v. Afshari*. 392 F.3d 1031 (9th Cir 2004) (petition for rehearing *en banc* pending), does not dispose of the issues raised here. The Court of Appeals reversed the lower court's determination that the statute was unconstitutional on its face for limiting judicial review of FTO designations exclusively to the D.C. Circuit, but found nonetheless that the <u>criminal trial court had</u>

jurisdiction to consider a due process challenge to a prosecution for donating to an FTO.
*Id* at 1035.

The *Afshari* court relied on the fact that the organization in question, the MEK also known as the People's Mojahedin Organization of Iran, had on several occasions challenged its FTO designation in the D.C. Circuit:

> [A] criminal proceeding may go forward, even if the predicate was in some way unconstitutional, so long as a sufficient opportunity for judicial review of the predicate exists. Here there was such an opportunity, which the MEK took advantage of each time it was designated a foreign terrorist organization.

*Id.* at 1036, n.24.

While Mr. Warsame maintains that the right to judicial review by someone other than the criminally accused does not satisfy due process and is in violation of Supreme Court jurisprudence, in the case at bar there was no meaningful opportunity for anybody to challenge its designation. In fact, unlike the circumstances in *Afshari*, no one ever did challenge the al-Qaeda designation. Nobody received notice of the intention to designate it, or its actual designation. Further, given the U.S. government's hostile position towards al-Qaeda, anyone who came forward to claim standing on behalf of the group would be subject to self-incrimination and likely criminal charges. In this case there is a complete absence of any judicial review of the designation by anyone.

It is simply not consistent with Supreme Court law to argue that the fact alone that an FTO has been designated, without any due process in reaching that designation, is

sufficient to create a binding predicate for a serious criminal prosecution. See, *e.g.*, *Mendoza-Lopez*, 481 U.S. at 837.  If this were true, the fact that there was a deportation order in *Mendoza-Lopez,* regardless of its validity, would have been sufficient and no due process challenge would have been allowed in the criminal case.[b]

> **C.**   **Precluding the defendant from challenging the FTO designation at trial violates his First Amendment right to a fair trial on the material support counts.**

By prohibiting the defense from explaining the nature of al-Qaeda, and therefore allowing the jury to make an independent determination whether Mr. Warsame intended to support the unlawful activities of an FTO, or whether he was supporting the lawful activities of an organization, Mr. Warsame is being deprived of his First Amendment right of association and his Sixth Amendment right to a fair jury trial. It is a fundamental principle of our jurisprudence that an accused is entitled to a jury determination of each element of the offense charged. See, *United States v. Gaudi*, 515 U.S. 506, 510-11 (1995); *Apprendi v. New Jersey,* 530 U.S. 466, 476-77 (2000).

---

[b] **Error! Main Document Only.**The reasoning by the Fourth Circuit in *United States v. Hammoud*, 391 F.3d 316 (4th Cir 2004, en banc), on this point is also lacking solid reasoning. Reviewing a challenge to 2339B on a plain error standard since the constitutional issues were not raised below, the Court concludes that although an organizations's designation as an FTO is an element of the statute, the validity of such designation is not.  *Id* at 331.  However, there is nothing in the statute which states or implies that the designation can be made without any basis, without any due process or meaningful judicial review by the persons directly affected.  If the fact of the designation alone was all that mattered, then it could be made by anyone, on any basis. Clearly, the

In *McKinney v. Alabama*, 424 U.S. 669 (1976), the Supreme Court held that a prior judicial determination of a predicate issue in a proceeding to which a criminal defendant was not a party cannot foreclose that defendant from arguing that his conduct was protected by the First Amendment.  The defendant in *McKinney* was charged with selling material  "judicially found to be obscene," and the defendant claimed that the charged activity was protected by the First Amendment. *Id*. at  672-73.  However, he was precluded from making this First Amendment argument because the statute allowed a prior proceeding - to which the defendant was not a party - to finally determine whether the activity was protected by the First Amendment.

In light of that limitation on the defendant in the criminal case, the Court struck down the Alabama obscenity statute as unconstitutional.  *Id.* at 677. "Such a procedure, without any provision for subsequent re-examination of the censor, would clearly be constitutionally infirm." *Id.* at 674   The Supreme Court further stated that, although the publishers of the materials and one bookseller were given notice and afforded an opportunity to be heard in the prior proceeding, the results of the proceeding could not "conclusively determine the First Amendment rights of others." *Id*. at 676 .

The Constitution simply does not allow the government to imprison an individual up to life, for what may be constitutionally protected activity, when he is precluded from

---

Constitution does not allow such a binding determination, which is an element of serious criminal penalties, to be so cavalierly applied.

22

raising such a defense at trial. Either the defense must be allowed to challenge the FTO

designation at trial, or the statute must be struck down.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendant's Motion to Dismiss Counts 1 and 2 of

the Superseding Indictment should be granted.

Respectfully submitted,
**s/ David C. Thomas**
One of the Attorneys for Mohammed Abdullah
Warsame

DAVID C. THOMAS
53 W. Jackson Blvd., Suite 1362
Chicago, IL  60604
(312) 957-0100

DAN SCOTT
ANDREA GEORGE
Federal Public Defender
300 S. 4th Street
Minneapolis, MN  55415
(612) 664-5858

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

*United States of America*

      Plaintiff(s)

v.

*Mohammed Abdullah Warsame*

      Defendant(s)

*LR 7.1(c) WORD COUNT COMPLIANCE CERTIFICATE REGARDING DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COUNTS 1 AND 2 OF SUPERSEDING INDICTMENT*

Case Number: *CR 04-29 (JRT/FLN)*

---

I, David C. Thomas, certify that Defendant's Memorandum of Law in Support of Motion to Dismiss Counts 1 and 2 of Superseding Indictment complies with Local Rule 7.1(c).

I further certify that, in preparation of this memorandum, I used Microsoft Word 2003, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count.

I further certify that the above referenced memorandum contains 5,976 words.


Date:  July 14, 2005

           **s/ David C. Thomas**
           *David C. Thomas*
           *53 W. Jackson Blvd.*
           *Suite 1362*
           *Chicago, IL 60604*
           *(312) 957-0100 (phone)*
           *(312) 957-0111 (fax)*

           ATTORNEY FOR *DEFENDANT*

25