# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 04-29 (JRT) |
| Plaintiff, | |
| | **MEMORANDUM OPINION AND** |
| v. | **ORDER ON MOTIONS TO QUASH** |
| | **ARREST AND SUPPRESS EVIDENCE** |
| MOHAMED ABDULLAH WARSAME, | |
| Defendant. | |

---

Thomas M. Hollenhorst, William H. Koch and W. Anders Folk, Assistant United States Attorneys, **OFFICE OF THE UNITED STATES ATTORNEY**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415; Joseph N. Kaster, **UNITED STATES DEPARTMENT OF JUSTICE**, Tenth & Constitution Avenue NW, Room 2649, Washington, DC 20530; for plaintiff.

David C. Thomas, **LAW OFFICES OF DAVID C. THOMAS**, 53 West Jackson Boulevard, Suite 1362, Chicago, IL 60604; Andrea K. George, Assistant Federal Public Defender, **OFFICE OF THE FEDERAL PUBLIC DEFENDER**, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415; for defendant.

Defendant Mohamed Abdullah Warsame has been charged with conspiring to provide material support and resources to a designated Foreign Terrorist Organization, and providing material support and resources to a designated Foreign Terrorist Organization, both in violation of 18 U.S.C. § 2339B. He is also charged with three counts of making false statements in violation of 18 U.S.C. § 1001(a)(2). This matter is before the Court on Warsame's motions to suppress and quash arrest. For the reasons explained below, the Court grants in part and denies in part the motions.

# BACKGROUND

Warsame is a naturalized Canadian citizen, and in 2002 he became a lawful permanent resident of the United States. Since that time and prior to his arrest, Warsame resided with his wife and daughter in Minneapolis, Minnesota. At the time of his arrest, Warsame was a full-time student at Minneapolis Community and Technical College, where he also worked twelve hours per week in a work/study program. He earned excellent grades, and was recommended for a scholarship by a professor. Warsame had never had any trouble with the law, in the United States or Canada, prior to his arrest in connection with this case.

Warsame seeks to quash his arrest and suppress statements made during interviews with agents of the Federal Bureau of Investigation ("FBI") that began on December 8, 2003. The following facts are derived from the testimony of FBI Special Agent Harry Samit at the evidentiary hearing held by the Court on November 16, 2005.

The FBI and the U.S. Attorney's Office had spent several months investigating Warsame prior to directly approaching him for the first time on December 8, 2003. The FBI began the investigation in July 2003. They had obtained his email communications and Immigration and Naturalization Services file. They tapped Warsame's phones and searched his apartment.[1] The FBI conducted physical surveillance with five or six people assigned to watch him. Prior to December 8, 2003, the FBI secured two houses at the Army National Guard military base in Little Falls, Minnesota ("Camp Ripley") and made

---

[1] The legality of the surveillance of Warsame is the subject of a motion that is under advisement by the Court. *See* Motion to Suppress the Fruits of All Surveillance and Each Search Conducted under FISA [Docket No. 43].

preparations for the expected interview with Warsame.  The houses were fitted with a closed circuit television system so that agents could view and hear the interview of Warsame from the adjacent house, and so that Warsame could be observed at all times. The adjacent house was equipped with communication devices that would allow the agents to tap into databases and follow up on information provided by Warsame.  The adjacent house was also manned with approximately eight or ten additional FBI personnel.  Samit explained that Camp Ripley was chosen to ensure privacy, and asserted that a hotel room or Warsame's home was not sufficiently private.

On December 8, 2003, Samit, Special Agent Kiann Vandenover, and Special Agent Joseph Rivers went to the door of Warsame's apartment.  They arrived at approximately 9:00 A.M. because they knew from past surveillance that Warsame was likely to be alone at that time.  Warsame had not been given any prior notice that the agents wanted to speak with him.  Vandenover knocked on the door and Warsame answered.  Vandenover identified herself and displayed her credentials.  She asked if the agents could enter the apartment and talk to him.  Warsame agreed and gestured to the living room area.

The three agents entered the small apartment.  Warsame sat on a small couch, and the three agents seated themselves on each side of Warsame, on a larger couch and a bed that were located in the living room.  The agents informed Warsame that they investigated international terrorism and that they were there to discuss his background and travels.  They asked if Warsame was willing to cooperate and provide them with information, and Warsame agreed.  To "break the ice," the agents started by asking

Warsame if he liked Minnesota, and asked about his employment and his educational background.   They discussed the fact that  Warsame was a permanent resident in the United States, and Warsame told the agents he "would like to become a citizen of the United States because it was the greatest country in the world because of its freedoms." (Tr. at 90.)   Samit characterized the conversation as "[v]ery lighthearted and very upbeat."  (*Id.* at 21.)   Warsame also asked questions of the agents, and the agents and Warsame exchanged information.

Samit asked Warsame to what countries he had traveled.  Warsame said he was originally a citizen of Somalia and that he had also traveled to Saudi Arabia.   The conversation went briefly to other subjects, and then Samit asked him if he had traveled to any other countries.  Warsame said no.  Samit said that he really wanted to discuss the other countries to which Warsame had traveled.  Warsame asked what other countries, and  Samit said Pakistan.   At that moment, Warsame "visibly sagged in his chair," "lowered his head," and "his whole posture and demeanor" slumped.  (*Id.* at 25.)  After some delay, Warsame admitted that he had traveled to Pakistan.  Samit again asked about additional countries, and Warsame said that there were no others.  After some prodding, Warsame admitted that he had traveled to other countries.

Samit then explained that there were  several years of Warsame's life that they were interested in discussing, and that discussions of this nature would take a good deal of time.  Samit explained that it was best that Warsame go with the agents "to a secure location which would keep his assistance private and assure his safety."  (*Id.* at 99.) Warsame agreed that the discussions should be private, but the record does not indicate

whether Warsame explicitly expressed a willingness to continue the interview at a different location.   The agents did not tell Warsame that they planned to take him to a military base, nor did they tell him the city of destination.   Samit testified that he did not make any threats or promises to Warsame, and that his clothing concealed his weapon. Samit testified that he "made it clear that [Warsame's] cooperation up until then had been voluntary and would continue to be so . . . and he would always have the option to not answer and to not remain with us."  (*Id.* at 27.)

The agents requested that Warsame pack some belongings and warm clothes because it was December in Minnesota.   Samit stood outside Warsame's bedroom and watched him as he packed his belongings.   Samit explained that he observed Warsame out of concern for agent safety.   Then, the agents called Special Agent Scheidler at the FBI office, and asked that he come to the apartment complex with a vehicle.   The agents told Warsame that arrangements would be made to assist his wife and family while he was gone, and that his wife would be given money.

After some time, Scheidler arrived with the vehicle.   Warsame was offered the front seat of the vehicle, and Samit and Rivers took the rear seats.   Vandenover departed at that point because she had been assigned to attempt contact with Warsame's wife. Warsame and the three agents left the apartment at 10:19 A.M.  Samit testified that by the time they left the apartment, Warsame had been told by the agents six or twelve times that the agents "were grateful for his voluntary cooperation," and that "[h]e was not under arrest."  (*Id.*  at 36.)

After the agents and Warsame started heading north to Camp Ripley, Samit offered Warsame a consent form to read.  Samit explained to Warsame that the form would be used to demonstrate that Warsame was coming with the agents voluntarily. The form also states, "I understand that my wife has been provided financial assistance while I am absent."  (Ex. 1.)  Warsame read the consent form, and indicated that he understood it. Warsame said that he did not want to sign the form, but did not explain why.  On the way to Camp Ripley, the agents and Warsame continued to discuss the subjects that they had discussed in the apartment.  According to Samit, the discussions were "[v]ery, very lighthearted."  (Tr. at 40.)

The agents and Warsame stopped to get lunch at a fast food restaurant in St. Cloud.  After receiving their food at the drive-through, they decided that they should use the restrooms because they still had some distance to drive.  No one accompanied Warsame into the restroom, but Samit stood outside the restroom in a place where he could see Warsame exit the restroom.

The agents and Warsame arrived at Camp Ripley at approximately noon.  The vehicle drove through the front gate of the base, which is marked by tall concrete structures and an iron perimeter fence.  The vehicle turned left as it entered the military base and approached a series of three white houses, which are typically used to house senior officers.  The houses are outside the secure area of the base, which is marked by a small guarded security building.  Snow covered the military base.

The agents escorted Warsame into the center house.  They told Warsame that this would be his home "for the next few days or for as long as he cared to stay with us."  (*Id.*

at 47.)   After giving him a tour of the house, the agents and Warsame sat down to eat their lunch.   During and after lunch, they watched some television.   Samit characterized Warsame as "very relaxed" sitting on the couch with his feet up on a table.   (*Id.* at 48.) At 12:42 P.M., the agents ended the lunch and said they were going to discuss his travels.

Samit, Rivers, and Scheidler interviewed Warsame until 3:23 P.M. with a break at 1:45 P.M.   Samit characterized the tone of the interview as "conversational" with Warsame and the agents asking questions and exchanging information.   (*Id.* at 50.)

When the agents terminated the interview, they told Warsame to relax in the house and went to the adjacent house to discuss their options.   After about 45 minutes the agents returned to the center house and informed Warsame that he should continue to relax and that they would all go to dinner soon.   They left for dinner at about 4:25 P.M.

Rivers offered Warsame $100 to cover his expenses, and Warsame accepted the money.   The agents and Warsame ate dinner at a restaurant in St. Cloud, where the agents allowed Warsame to use a steak knife.   After dinner, the agents and Warsame went to a grocery store and bought some snacks and other items.   Warsame was not shadowed in the grocery store.   When the agents and Warsame returned to Camp Ripley, the agents told Warsame that they were done with the interviews for the day and that he should make himself at home.   The agents offered to arrange for Warsame to use the telephone to call his wife, but he declined at that time.   The agents told Warsame that he could take a walk if he wanted, but that an agent "would accompany him on that walk for his safety."   (*Id.* at 120.)   Warsame watched some television and then said he was going upstairs to take a nap.

Warsame came back downstairs at approximately 10:00 P.M.  Samit introduced Warsame to two other agents, Special Agents Rapp and Sims.  Samit left the house and Rapp and Sims were instructed to watch Warsame.  The two agents and Warsame watched television together.  Warsame later decided to contact his wife.

The telephones bore a large notice indicating that all calls are monitored and recorded, and required the use of a calling card.  Rapp and Simms provided a government calling card to Warsame and assisted him in placing the call.  Warsame and his wife spoke in Somalian, but the Court was provided a translation of the recording.  Warsame told his wife, "I swear to God, that I am under arrest."  (Ex. 19 at 1.)  He said he has been taken to a "far away city which takes two or three hours to reach."  (*Id.*)  He told his wife several times that the agents had promised to give his wife money, and he mentions that they had given him money.  He explained that the agents knew a lot about him, including his travels.  Warsame's wife told him not to talk to the agents, and to ask for a lawyer.  She asked for his telephone number, and after some delay one of the agents was able to provide it.  Warsame appeared somewhat apologetic during the conversation and his wife appeared very angry.  The conversation lasted about 15 minutes.  After the conversation, Warsame went to bed.

When Warsame awoke on the morning of December 9, 2003, he proceeded downstairs and spoke with Rapp and Sims.  The agents inquired about Warsame's comfort.  Warsame told them that he needed to attend to his schoolwork.  Samit was not present during the conversation, but Samit testified that Warsame said he "might need to return to the Cities that day."  (Tr. at 65.)  Rapp and Sims responded by saying that "they

would transmit his request" and informed Samit and the other agents.  (*Id.*)  Scheidler next saw Warsame and inquired about Warsame's comfort.   According to Samit, "Warsame repeated the request to [Scheidler] about possibly returning to the Cities that day."  (*Id.*)  In response, "Special Agent Scheidler agreed that progress had certainly been good," and "he anticipated that we would finish that day and return him."  (*Id.*)  Samit testified that Warsame acted very grateful in response, and "expressed an interest in continuing with the exchange of information."  (*Id.*)  Just before 8:00 A.M., Samit and Rivers returned to the house.  Samit told Warsame that he had heard from Sims and Scheidler that "he was anxious to get back."  (*Id.* at 66.)  Samit said that they would continue with the interviews "if it was okay with him" and he "anticipated that we would certainly be satisfied and take him back."  (*Id.*)  Samit testified that he "reiterated to him that anytime he was ready to leave he just merely needed to say so, and we would return."  (*Id.*)   Samit testified that Warsame responded that "he wanted to get the interviews and the discussions finished first."  (*Id.*)

The agents resumed questioning Warsame about his travels at approximately 8:00 A.M. and concluded at 11:10 A.M., with a break at 9:20 A.M.  Samit characterized the tone of the questioning as "very conversational."  (*Id.* at 68.)  At the evidentiary hearing, Special Agent Samit provided details on how the questioning of Warsame was terminated.   After Warsame provided a detailed account of his knowledge of "some overseas associates," Warsame "said he would like to be finished at that point."  *Id.*  In response to a question posed by the prosecutor, Samit added that Warsame also remarked that Warsame "still wanted to finish the interview."  (*Id.*)  Samit "suggested another

break" and "gave him a chance to think about it." (*Id.* at 68-69.) Samit left the house and consulted with the prosecutor and others. They agreed that Special Agent Samit would ask Warsame one more time, remind him of his voluntariness, and "reiterate that we appreciated his cooperation but that he could end it at any time." (*Id.* at 69.) When Samit returned, he asked if Warsame wanted to continue. Warsame said he wanted to go back, and Special Agent Samit told him to pack his bags.

After Warsame had packed his bags, the agents asked him again if he would be willing to sign the consent form stipulating that the interviews had been voluntary. Warsame read the form again, and signed it. The agents and Warsame then departed for the Twin Cities. After driving about 30 minutes, Warsame told Samit that he refused to sign the consent form the previous day because he was afraid that the information he revealed would put him and his family in danger. The agents did not question Warsame in the car on the drive back.

During the course of the drive back, Samit received instructions not to take Warsame back to his apartment. Samit was told to bring Warsame to the FBI office in Minneapolis, and he did. At the FBI office, Warsame was arrested on the authority of a material witness warrant issued in the Southern District of New York. A second arrest warrant was issued in the District of Minnesota on January 20, 2004 based upon an indictment charging Warsame with a violation of 18 U.S.C. § 2339B.

On June 6, 2005, Warsame filed a motion to quash arrest and suppress evidence, and on July 14, 2005, Warsame filed an amended motion to quash arrest and suppress

evidence.  On November 15, 2005, the Court held an evidentiary hearing and heard oral argument on the motions.

## ANALYSIS

## I.      SUPPRESSION PURSUANT TO *MIRANDA v. ARIZONA*

"The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."  *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "*Miranda* accordingly requires that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued *prior to questioning* whenever a suspect is (1) interrogated (2) while in custody."  *Id.* (emphasis original).

An individual need not be arrested formally to be "in custody."  As the Eighth Circuit explained:

> Custody occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way.  In determining whether a suspect is "in custody" at a particular time we examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a "reasonable person in the suspect's position would have understood his situation" to be one of custody.  If [the defendant] believed his freedom of action had been curtailed to a degree associated with formal arrest, and that belief was reasonable from an objective viewpoint, then [the defendant] was being held in custody during the interrogation. The determination of custody arises from an examination of the totality of the circumstances.

*Id.* (emphasis original) (citations omitted).  The Eighth Circuit has articulated a six-element test for this determination of custody, including:

- 11 -

(1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

(2) Whether the suspect possessed unrestrained freedom of movement during questioning;

(3) Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4) Whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) Whether the atmosphere of the questioning was police dominated; or,

(6) Whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349.  The first three indicia are "mitigating factors," the presence of one or more of which "would tend to mitigate the existence of custody at the time of the questioning."  *Id.*  The final three indicia are "coercive factors," the presence of one or more of which would tend to compel a finding of custody.  *Id.*

Defendant argues that his motion to suppress should be granted because the agents obtained statements from him in a custodial setting without providing him a Miranda warning.  Defendant asserts that he was in custody starting from the interview at his home on December 8, 2003 and continuing through the interviews at Camp Ripley on December 8 and 9, 2003.

As explained below, the Court concludes that the interviews of Warsame became custodial on the morning of December 9, 2003.  Custodial status was triggered when Warsame told the agents that he was anxious to get back home, and agents responded by indicating that they would "transmit his request," and by stating that they anticipated that

they could finish the interview that day and return him.   In reaching its conclusion, the Court applies the six *Griffin* factors to the circumstances that existed on the morning of December 9, 2003, and distinguishes the preceding interviews that the Court concludes were non-custodial.

### A.   Informed that the Questioning Was Voluntary

The first factor asks whether the defendant was told that the interview was voluntary, that he was free to leave, or that he was not under arrest.  *Griffin*, 922 F.2d at 1349.  An explicit assertion that the defendant may end the encounter provides "a clear understanding of his or her rights and generally removes any custodial trappings from the questioning."  *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006) (citing *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)).  Samit testified that agents told Warsame that the interviews were voluntary and that he was not under arrest "[p]robably close to 20 times" over the course of the two days of interviews.  (Tr. at 75.)  The presence of the first mitigating factor is the primary reason why the Court ultimately concludes that the interviews conducted in the apartment, in the car, and at Camp Ripley on December 8, 2003 were non-custodial.

The circumstances that unfolded on the morning of December 9, 2003, however, sharply changed the tone of the encounter.  When Warsame awoke on the morning of December 9, 2003, he proceeded downstairs and immediately told the agents present that he would like to return home.  The agents responded by telling Warsame "that they would transmit his request."  (Tr. at 65.)  Warsame repeated his desire to return home to

the agent that he next encountered.  The agent responded that "progress had certainly been good" and that "he anticipated that we would finish that day and return him."  (*Id.*)

The responses provided by the agents served to counteract their previous statements to Warsame that he was free to terminate the interviews at any time.  The responses indicate that Warsame was not actually in a position to decide when to terminate the interviews, and that it was the agents that would evaluate the progress and determine if the interviews could be terminated.  If Warsame were truly free to terminate the interview, a much different response from agents would have been expected.  Agents would have responded by clarifying whether Warsame was asking to terminate the interview at that point, and again making clear that if he wanted to go they would leave immediately.  Rather, the agents responded that they would transmit his request and that they would likely be able to return him.

Approximately 45 minutes after Warsame first explained to the agents that he wanted to return home, Samit approached Warsame.  Samit told Warsame that he heard from the other agents that he was "anxious to get back."  (*Id.* at 66.)  Samit suggested that they continue the interview and "anticipated that we would certainly be satisfied and take him back."  (*Id.*)  As with the responses given by the other agents, this statement by Samit would lead a reasonable person in this situation to believe that the decision to terminate the interviews was ultimately to be made by the agents, not Warsame.  Samit testified that he also reiterated to Warsame that if he were ready to leave he merely had to say so.  However, another assertion by the agents that Warsame was free to go would seem hollow because Warsame's earlier expressions that he wanted to return home had

been met with resistance.[2]  *Cf. Czichray*, 378 F.3d at 829 ("This is not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators.")

While the presence of the first factor generally leads to a finding of non-custodial status, the events that transpired on the morning of December 9, 2003 change the analysis.  The agents' reluctance to terminate the interviews is inconsistent with their previous statements that Warsame could terminate the interviews at any time.  Because agents refused on that morning to act consistently with their statements about the voluntary nature of the interviews, the Court cannot conclude that these statements weigh toward a finding of non-custodial status on the morning of December 9, 2003.[3]

---

[2] Unfortunately, the Court will never know the precise language used by Warsame to communicate his desire to return home, or the precise language used by the agents to convince Warsame to continue the interviews.  Despite the location where most of the interviews and discussions took place, a house evidently wired for all conceivable video and audio monitoring of the defendant, the FBI failed to record these critical discussions.  The agents had the capacity to record the discussions but chose not to do so, forcing the Court to rely solely on the testimony of Samit.  This is especially unfortunate because Samit was not even present when Warsame first articulated his desire to return home.  Moreover, Samit is not a neutral party in this case.  Even slight alterations in the wording of Warsame's requests or the agents' responses could dramatically change the import of the words on the Court's determination of custodial status.  The time has long since passed for the FBI to start recording interviews of this type.  Failure to do so can make it very difficult for courts to make important decisions involving basic constitutional rights.

[3] Not only do the responses by agents on the morning of December 9, 2003 serve to remove from that time forward the presence of the first mitigating factor, the responses have an aggravating quality that contributes to a finding of custodial status.  The responses indicate that the agents were in total control, consistent with the Court's finding that the interviews at Camp Ripley were police dominated (the second aggravating factor under *Griffin*).

### B.     Unrestrained Freedom of Movement

The second factor asks whether the defendant possessed unrestrained freedom of movement during questioning.  *Griffin*, 922 F.2d at 1349.  Courts should be less likely to find custodial status if a defendant is free to move about.  *Id.* at 1350; *see United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (finding that the custodial nature of an interview was obviated where the interviewing officers allowed the defendant during questioning to go unaccompanied to an unlocked, unguarded location to speak with a relative).

To begin, the Court considers that agents continually chaperoned Warsame.  The Eighth Circuit has acknowledged that "the likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest."  *Griffin*, 922 F.2d at 1350-51.

The Court next considers that Warsame was never handcuffed or otherwise actually physically restrained.  However, this does not necessarily mean that defendant was free to move about at the interview locations.  *See Ollie*, 442 F.3d at 1138.  Agents questioned Warsame in the car while they were traveling to Camp Ripley from Minneapolis.  Of course, Warsame would not feel free to move about while the car traveled at highway speeds.  On the other hand, Warsame could have asked agents to stop the car.  Warsame's ability to move about at Camp Ripley also depended on the participation of agents.  Camp Ripley is a military base in a relatively isolated rural location, and Warsame did not have access to a vehicle.  Warsame did not have a cellular phone, and the phones at the military base required a calling card.  Moreover, the

conversation between Warsame and his wife demonstrates that Warsame had no idea where the agents had taken him.  Because it was the middle of the winter and the base was covered in snow, Warsame could not simply walk away from the military base.  The agents had also implied to Warsame that he was in danger by stating that if he wanted to take a walk on the military base an agent would accompany him for his safety.  Under these circumstances, Warsame would have had to ask agents to return him or to give him access to a phone so that he could try to arrange other transportation.  The Court finds that the cumulative effect of the circumstances at Camp Ripley comes close to actual physical restraint.  Other than outright incarceration, it is difficult to conceive of a more restraining situation than an isolated military facility in the dead of winter.

In addition, the feeling of isolation likely experienced in this situation could have contributed to the creation of a binding psychological restraint on freedom of movement. *See Miranda v. Arizona*, 384 U.S. 436, 455-58 (1966) (describing how persons can be forced to succumb to the will of interrogators and forgo their constitutional rights even in the absence of physical force or restraint).  The agents by their actions ensured that Warsame was isolated throughout the interviews.  For example, they timed their arrival at his home to ensure Warsame would be alone.  *See United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989) (finding custody in part because the officers isolated the defendant from others who might lend moral support).  Subsequent interviews in the moving car and at the military base in the middle of winter likely intensified the feeling of isolation over the interview period.  The psychological effect would have compounded over time,

and this feeling of isolation could lead a reasonable person to associate the circumstances with a formal arrest.  Indeed, Warsame told his wife that he believed he was under arrest.

Given the circumstances, and especially considering the circumstances at the end of the interview period, the Court cannot find that this factor weighs toward a finding of non-custodial status.

### C.       Voluntarily Acquiesced to Official Requests to Respond to Questions

The third factor asks whether the defendant initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions.  *Griffin*, 922 F.2d at 1349.  Warsame did not initiate contact with authorities.  Rather, three agents showed up at the door of Warsame's apartment uninvited.   However, Warsame did voluntarily acquiesce to the agents' request to respond to questions, at least initially.  When Warsame answered their knock at the door, the agents explained that they were with the FBI and wished to speak with him.  Warsame agreed and invited the agents into the apartment. Warsame later left with the agents with the understanding that  the interviews would continue at another location.   As such, the third mitigating factor is present for the interview at his home and the first interview at Camp Ripley.  This weighs toward a non-custodial finding for these interviews.  However, as discussed above, the Court questions whether Warsame's participation in the interview on December 9, 2003 was the result of his voluntary decision.  At that point, Warsame indicated that he wanted to be done with the interviews but the agents met his request with resistance.  The third mitigating factor is therefore not present for the interview on December 9, 2003.

### D.        Strong Arm Tactics or Deceptive Stratagems

The fourth factor asks whether strong arm tactics or deceptive stratagems were employed during questioning.  *Griffin*, 922 F.2d at 1349.   Defendant was never threatened, nor were weapons ever displayed to him.  Further, Samit testified that the tone of the interviews was generally friendly and light-hearted.

Although strong arm tactics were not used, agents were not always candid with Warsame.  Deceit that a reasonable person would perceive as restricting his freedom to depart affects the custody determination.[4]  *Ollie*, 442 F.3d at 1138-39.  To begin, the agents told Warsame at his home that to ensure his safety they should continue the interview at a different location, and they later told him at Camp Ripley that to ensure his safety they would accompany him if he wanted to take a walk.  These statements were deceitful because there was no reason to believe that Warsame was ever in any danger.  These statements could instill in a reasonable person some concern for personal safety, which in turn might affect how a reasonable person would perceive his freedom to simply walk away from the military base.  However, the effect of this deceit on the custody determination is not great.  Agents did not elaborate on the statements, and without more, the statements given by the agents were not enough to make a reasonable person actually fearful.

---

[4] The agents promised Warsame that his wife would be given money if he cooperated and accompanied them to Camp Ripley, but she was never given any money.  This deceitful statement almost certainly helped persuade Warsame to participate in the questioning.  It does not affect the custody determination, however, because it would not affect how a reasonable person would perceive his freedom to depart.

Next, the agents repeatedly suggested that they would return Warsame to Minneapolis when he wished to terminate the interviews. However, the Court doubts that the agents ever intended to allow Warsame to go home. When Warsame absolutely refused to answer any more questions, he was brought to the FBI office and arrested. Even if the statements by agents were untruthful from the beginning, the statements would not affect a reasonable person's perception of his freedom to depart as long as the person had no reason to doubt the truth of the statements. However, the agents' responses to Warsame's request to terminate the interviews on the morning of December 9, 2003, would make a reasonable person doubt the truth of the previous statements, as explained above. From that point forward, the deceit does bear on a reasonable person's perception of his freedom to leave. A reasonable person would feel that he was not actually free to depart and that the agents controlled the interview process. In this situation, a reasonable person would be more likely to associate his circumstance with a formal arrest.

In sum, the Court concludes that agents used some deceptive stratagems, and that the use of the stratagems began at Warsame's home. This factor therefore contributes to a finding of custodial status for all of the interviews. However, the impact of this factor is minimal until the morning of December 9, 2003. At that point, the factor weighs heavily toward a finding of custodial status.

### E. Police Dominated Atmosphere

The fifth factor asks whether the atmosphere of the questioning was police dominated. *Griffin*, 922 F.2d at 1349. The *Miranda* court was concerned about the effect

of a police dominated atmosphere on a defendant's will to resist self-incrimination during interrogation. *Miranda*, 384 U.S. at 451. "The question is whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the investigation was police dominated." *Griffin*, 922 F.2d at 1352.

Police domination is indicated when police "assume control of the interrogation site." *Id.* The Eighth Circuit has held that where the conduct of the police leads a defendant to believe that the police have taken full control of the scene, courts should be more likely to recognize the existence of custody. *Id.* One way that officers "diminish the public character of, and assert their dominion over, an interrogation site" is by removing a defendant from the presence of third persons who could lend moral support. *Id.* (citing *United States v. Beraun-Panez*, 812 F.2d 578, 582 (9th Cir. 1987) (agents interrogating rancher in pasture demonstrated domination of interrogation by stopping co-worker from approaching suspect)).

Here, the interview of Warsame began in his home. Agents purposefully arrived at his home when they expected Warsame to be alone. Three agents then crowded into the small living room of Warsame's apartment and began to question him. An agent followed Warsame to his bedroom when he went to pack his bag. Despite the fact that the agents exerted dominion over the situation in these ways, the Court cannot find that the atmosphere in his home was police-dominated. Warsame was in a familiar place, which "softens the hard aspects of police interrogation." *Griffin*, 922 F.2d at 1355 n.15. There is no evidence that agents prevented Warsame from using the phone, and agents

suggested that Warsame leave a note for his wife.  The location of the interview did not completely isolate Warsame from the presence of third parties.  Indeed, a maintenance person stopped by the apartment during the interview.  Further, the length of the interview at the home was not long.  It lasted just over an hour.

The context of the interview became more police dominated when the agents and Warsame were in the car traveling to Camp Ripley.  Three agents and Warsame occupied this small, confined space.  In addition, any reasonable person would find that an interview in an agent's car would feel more police dominated than an interview in a home or in a public space.  However, the tone of the interview helps to mitigate these circumstances.  Samit characterized the interview in the car as "[v]ery, very lighthearted."  (Tr. at 40.)  Warsame was seated in the front seat of the vehicle, rather than the back seat where arrested persons would be seated.  The agents also stopped to buy fast food and use the restroom, and Warsame was not followed into the restroom.

Upon arrival at Camp Ripley, police domination of the setting was pervasive.  A military base would be an unfamiliar and uneasy setting for any reasonable person.  The fact that the base was nearly unoccupied because it was the middle of winter would make a person feel even more isolated.  Warsame was not told the name of the city to which he was taken.  Although Warsame was permitted to use the phone to call his wife, he could not use the phone unless he asked permission.  Moreover, the phones bore signs similar to those found in prisons that indicate that conversations would be recorded.  Warsame was chaperoned at all times, and this continuous presence of agents also contributes to the police domination.  Although there were several breaks, including dinner at a

restaurant off the base, the interviews at the military base spanned two days. The length of the interviews therefore also adds to the police domination.

A reasonable person in this situation would have believed that the agents had taken full control, and it appears to the Court that the agents did have full control of the setting at Camp Ripley. The agents carefully chose this setting for the interviews. They installed a closed circuit television system. An adjacent building was manned with additional agents kept out of sight of Warsame and was equipped with communication devices. In short, the agents resorted to domineering practices by conducting the final interviews in the controlled setting of a military base. This factor therefore weighs toward a custodial finding for the interviews conducted at Camp Ripley.

### F.     Arrest upon Termination of the Interview

The sixth and final factor asks whether the suspect was placed under arrest at the termination of the questioning. *Griffin*, 922 F.2d at 1349. On December 9, 2003, when Warsame finally refused to answer any more questions, agents brought Warsame back to Minneapolis and arrested him. The presence of this factor weighs toward a finding of custodial status during the preceding interview on the morning of December 9, 2003.

In sum, an application of the six factors leads the Court to conclude that a custodial finding is warranted for the final interview of Warsame. The circumstances do not warrant a finding of custodial status during the initial interview of Warsame at his home, but over the two days of interviews the circumstances became increasingly restrictive of Warsame's freedom. After Warsame's request to return home on the morning of December 9, 2003 was met with resistance, the Court finds that his freedom

was thereafter curtailed to a degree associated with a formal arrest.   The agents

interviewed Warsame over a three-hour period on the morning of December 9, 2003.

Because agents did not provide Warsame with a Miranda warning, the Court suppresses

the statements obtained from Warsame during that final interview.   The Court therefore

grants in part Warsame's motion to suppress.


## II.   SUPPRESSION PURSUANT TO *PAYTON v. NEW YORK* AND *NEW YORK v. HARRIS*

Warsame argues that he was arrested at his residence without a warrant, and that

his statements must therefore be suppressed pursuant to *Payton v. New York*, 445 U.S.

573 (1980) and *New York v. Harris*, 495 U.S. 14 (1990).   While a warrantless arrest in a

public place is permissible as long as the arresting officer has probable cause, *Payton v.

New York* "drew a line at the entrance to the home."   *Harris*, 495 U.S. at 18.   Before

officers can enter a house to effect an arrest, an arrest warrant is required to "interpose

the magistrate's determination of probable cause."   *Id.* (quoting *Payton*, 445 U.S. at 602).

The holding in *Payton* stemmed from the "overriding respect for the sanctity of the home

that has been embedded in our traditions since the origins of the Republic."   *Payton*, 445

U.S. at 601.

As explained above, the Court concludes that the interview of Warsame at his

home was non-custodial.   For these same reasons, the Court concludes that Warsame was

not illegally seized at his residence.   Unlike the cases he relies upon, FBI agents

repeatedly advised Warsame in his home that his cooperation was voluntary and that he

was not under arrest.   Because the Court concludes that Warsame was not illegally seized

in his residence, *Payton* and *Harris* do not provide justification for suppressing his statements.

### III.    MOTION TO QUASH ARREST AND SUPPRESSION AS FRUITS OF AN UNLAWFUL ARREST

Warsame argues that his arrest pursuant to the material witness warrant was without probable cause, that this arrest must therefore be quashed, and that his statements must be suppressed as fruits of an unlawful arrest.[5]  Information provided by confidential sources was used to provide a basis for the material witness arrest warrant.  Warsame argues that the information obtained from the confidential sources cannot be deemed sufficiently trustworthy to provide a constitutionally adequate basis for the arrest. Warsame emphasizes that the confidential sources were detained in a foreign country when they were interrogated, and therefore it is possible that they were tortured.  The sealed affidavit supporting the warrant concedes that the sources may not have been completely candid during the interrogations.

The Court agrees with defendant that there are valid reasons to question the reliability of the statements from the confidential witnesses.  However, this does not provide a basis for quashing Warsame's arrest.  The material witness warrant did not rely solely upon statements from the confidential sources.  The warrant also relies upon information derived from documents collected in Afghanistan by the FBI and the United States military.  These documents provide some confirmation of information supplied by the confidential sources.  In addition, the warrant relies upon statements of Warsame,

---

[5] Warsame does not dispute that his subsequent arrest on January 20, 2004 was based on probable cause.

which also largely confirm the information supplied by the confidential sources. Even excluding those statements obtained during the custodial interview on December 9, 2003, the Court concludes that there is an adequate basis for the material witness warrant.

Further, Warsame's arrest on the material witness warrant occurred after his statements to the FBI on December 8 and 9, 2003. No statements were obtained from Warsame subsequent to his arrest on the material witness warrant. As such, even if the arrest on the material witness warrant were illegal, his statements cannot be characterized as the fruit of an illegal arrest. The Court therefore concludes that there is no basis to quash the arrest of Warsame or to suppress any evidence as the fruit of this arrest.

## IV.    SUPPRESSION FOR VIOLATION OF VIENNA CONVENTION

Warsame argues that his statements to FBI agents must be suppressed because his rights under Article 36 of the Vienna Convention were violated. The Vienna Convention provides that "if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner." Art. 36(1)(b). "In other words, when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests." *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2675 (2006). Article 36(1)(b) also provides that "the said authorities shall inform the person concerned [i.e., the detainee] without delay of his rights under this sub-paragraph." Art. 36(1)(b).

The United States Supreme Court has made clear that suppression is not an appropriate remedy for a violation of the Vienna Convention. *See Sanchez-Llamas*, 126 S. Ct. at 2681-82 (explaining that the reasons that courts require suppression for Fourth and Fifth Amendment violations are entirely absent from the consular notification context). Moreover, there is evidence in the record indicating that Warsame was notified of his rights to consular notification, and that upon his request, the FBI notified the Canadian consulate in Minneapolis of Warsame's arrest. Accordingly, the Court declines to grant Warsame's motions to suppress on this basis.

## ORDER

Based on the foregoing, and all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's motions to quash arrest and suppress evidence [Docket Nos. 36 and 45] are **GRANTED IN PART** and **DENIED IN PART**. The motions are granted with respect to suppression of Warsame's statements obtained on December 9, 2003, and denied in all other respects.


DATED:    May 31, 2007               _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                  JOHN R. TUNHEIM
                                      United States District Judge