## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No.  04-29 (JRT/FLN) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **POSITION OF DEFENDANT** |
| | ) | **WITH RESPECT TO SENTENCING** |
| | ) | |
| MOHAMED ABDULLAH | ) | |
| WARSAME, | ) | |
| | ) | |
| Defendant. | ) | |

    This memorandum is submitted in support of a sentence that takes into consideration the §3553(a) factors present in Mohamed Warsame's case supporting a sentence of 67 months imprisonment, which represents every day of the over five and one half years Mr. Warsame was held in solitary confinement as a pretrial detainee and reflects a sentence comparable to similarly situated individuals.

    Understandably, the infamous, dastardly and tragic deeds and events of September 11, 2001, have caused a maelstrom of human emotions to be not only released but to also create a human reservoir of strong emotional feelings such as fear, anxiety and hatred as well as a feeling of paranoia in many of the hearts and minds of the inhabitants of this great nation.  These are strong emotions of a negative nature which, if not appropriately checked, cause the ability of one to properly reason to be impeded or to be blinded in applying our basic principles of law.  In applying our democratic principles of law, the only blindness that is allowed and acceptable is that in which justice is blind to such things as a person's national origin or ethnic background or one's race or color or religious beliefs, because those characteristics play no role in deciding legal issues such as those that confront this Court today.  If we truly believe in principles espoused in this nation's Declaration of Independence and the United States Constitution, we must give more than lip

service to those principles. We must fairly and fully apply those principles to each and every person entitled to their protection no matter how distasteful, frightening or loathsome it might be to some in doing so. We must always be vigilant to make certain that the rule of law, and not emotion, carries the day. There can be no doubt that the Constitution of the United States and our concepts of democracy provide sufficient strength and protection to bring citizens to justice without weakening our security. We must never adopt an "ends justifies the means" philosophy by claiming that our Constitution and democratic principles must be temporarily furloughed or put on hold in cases involving alleged terrorism in order to preserve our democracy. To do so, would result in victory for the terrorists.

*United States v. Goba, et al*, 02-M-107 (W.D.N.Y. October 8, 2002)(Decision and Order, Mag. J. H. Kenneth Schroeder, Jr., Preamble).

## I.    Legal Standard

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court transformed the Sentencing Guidelines from a mandatory scheme into an advisory resource. Post-*Booker*, the Court must consider the other factors listed in 18 U.S.C. § 3553(a), as the Guidelines are but one factor of many the Court must examine in order to determine the appropriate sentence. *Gall v. United States*, 128 S.Ct. 586, 596 (2007). The Supreme Court reiterated in *Gall* that "the Guidelines are not mandatory, and thus the range of choice dictated by the facts of the case is significantly broadened." *Id.*, at 602 (citations omitted). *Gall* requires that in addition to considering the Guidelines, the "district court should . . . consider all of the 3553(a) factors to determine whether they support the sentence requested by the party. In so doing, he may not presume the Guidelines range is reasonable. He must make an individualized assessment

2

based on the facts presented." *Id*, at 596-97 (citations omitted); *see also United States v. Miranda*, 505 F.3d 785, 791 (7th Cir. 2007)("Although the guidelines are treated as advisory after *Booker*, the application of section 3553(a) is mandatory.")

The Supreme Court requires judges "to 'impose a sentence sufficient, but not greater than necessary to comply with' the basic aims of sentencing" in § 3553(a), *Rita v. United States*, 127 S.Ct. 2456, 2463 (2007), which include the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to create adequate deterrence; to protect the public from further crimes of the defendant' and to provide the defendant with needed . . . medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a). Section 3553(a)(1) also gives sentencing courts "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall*, 128 S.Ct. at 596 n.6.

Sentencing a criminal defendant should be a difficult task for any conscientious jurist. It should neither be an easy nor merely a reflexive task because, after evaluating and weighing all of the doctrines, theories and applicable law, the decision to be reached is not really about arriving at the "right" result since there are no right results; "a criminal sentence must reflect an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Floyd*, 945 F.2d 1096, 1102, (9th Cir. 1993), (quoting *United States v. Barker*, 771 F.2d 1362, 1363 (9th Cir. 1985), *reversed on other grounds*, *United States v. Atkinson*, 990 F.2d 501, 503 (9th Cir.

1993).   A criminal sentence, therefore, should adequately address and reflect how an individual got to this place in life.  The guidelines are only one factor of many the Court is directed to consider.  *Gall*, 128 S.Ct. at 596.

**II.     The § 3553(a) Factors**

   **A.     The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**.

      **1.     The Soviet Invasion of Afghanistan.**

The United States and al Qaeda were not always on opposing sides.  At one point in history the United States' and al Qaeda's interests coincided.  It all began around Christmas, 1979, when the Afghan people awoke to find the Soviet Union had invaded their country.[1] Although initially accepting of the Soviet presence, the Afghan people soon began to resent the repression of their religion and culture.[2]  The Afghan people rose in revolt against the Soviet army.  Muslims from around the world joined their battle cry.[3]  Jihad was declared.[4] Muslim fighters came from Saudi Arabia, Yemen, The United Arab Emirates, Qatar and as far as the Philippines and Malaysia;[5] for the first time in over 400 years, a multinational

---

[1]   *The Soviet Invasion of Afghanistan in 1979: Failure of Intelligence or of the Policy Process?*  Institute for the Study of Diplomacy, Edmund a.  Walsh School of Foreign Service, Georgetown University, Working Group Report, No. III, September 26, 2005, 1, 6)

[2]   Testimony of FBI Agent Harry M. Samit before the Grand Jury, January 20, 2004, hereinafter "GJ1", 4.

[3]   Id.

[4]   Id.

[5]   Id., 5.

Muslim army took the field.  "Pakistan served as the base for numerous Mujahidin groups who fought the Soviets with material support from Pakistan, the U.S. and others."[6]

Many rich Saudis contributed money.  "Osama bin Laden is one of those who by the mid 1980s had established himself inside Afghanistan and was one of these wealthy Arabs providing assistance to the Afghan Freedom Fighters."[7]  "The United States was also backing the Mujahideen Freedom Fighters."[8]  The United States' and bin Laden's "interests coincided" against a common enemy.[9]

Al Qaeda formed out of a growing consciousness that not only was atheistic communism a danger to Islamic beliefs, but also a recognition that Western materialism posed as great a threat to Islam.

> Abdullah Azzam who was again like bin Laden was less of a fighter and more of an inspirational figure.  Osama bin Laden himself again more of a money man, more of an organizer, less of a fighter in spite of the popularized images of bin Laden shooting guns on television and talking on the radio in kind of an operation context.  That really was never Osama bin Laden's role.  He was a money guy, he was a[n] inspiration.[10]

---

[6] *Pakistan - Afghanistan Relations*, Bolsten, Archie M., United States Department of State, Date/Case Id: November 21, 2003, 200104208.

[7] GJ1, 6.

[8] Id., 6-7

[9] Id., 7.

[10] Id., 8.

In 1989, after ten long and costly years, the Soviets withdrew from Afghanistan.

> [I]t's common consensus that the Afghan Mujahideen with the help of their Arab allies like Osama bin Laden and certainly with the support of the West, United States and Britain, forced the Soviet Army to withdraw and we counted it as a strategic victory.[11]

When the Soviets withdrew, their Communist puppet government fled as well, leaving a power vacuum in Afghanistan. It was filled with "feuding warlords of a variety of different political and religious beliefs as well as the Arab fighters that people like Osama bin Laden had brought into the country."[12] Having defeated the Soviets, the newly empowered *mujahedeen* directed their skill and fury at the West.

### 2.     Warsame's History

Mohamed Abdullah Warsame was born on August 12, 1973, in Mogadishu, Somalia. At the age of 9 or 10, he left Somalia to attend school in India. When he returned to Somalia in 1990, the country was in the middle of a civil war. Many Somalis were dying of starvation and from the ravages of war. Mogadishu had become a dangerous place to live. Thousands of Somalis were displaced. Around 1989, at the age of 17, Mohamed fled his country and traveled alone to Canada to make his way in the world. He traveled first to Rome, then New

---

[11]   Id., 11.

[12]   Id., 12.

York, and finally to Toronto.[13]   He received political refugee status and later became a

naturalized Canadian citizen.[14]

In 1995, at the age of 22, he entered the United States to marry his wife Fartun Farah,

in an arranged marriage.[15]   Fartun was a lawful permanent resident living in Minneapolis.[16]

While he immediately applied for resident alien status so that he could live with his wife in

Minneapolis, the application remained pending until 2002.[17]   Thus, one month after his

marriage ceremony, he had to return to Canada.  His wife remained in Minneapolis.  During

this time, he became a deeply religious man.  Following Islamic law, Mohamed Warsame

traveled to Saudi Arabia for *Umrah*, a religious pilgrimage,[18] enjoined upon all Muslims who

are physically capable.

Back in Canada however, things were not going well for Mr. Warsame.  By 1999, he

had begun skipping classes and eventually dropped out of high school.  He was working odd

jobs which he disliked because he disliked hard, physical labor.[19]   He could not seem to find

---

[13]  FBI 302 summarizing statement of Mohamed Warsame, obtained on December 8-9, 2003, hereinafter "302".

[14]  302, 1.

[15]  Id., 2.

[16]  Id., 2.

[17]  Id.

[18]  Id.

[19]  Id., 1-2.

his way in the world.  Like so many others, Mr. Warsame had learned of Afghanistan as a result of the Soviet invasion and came to believe that the Afghans were a "special people" because no foreign power in modern times had been able to conquer them.[20]  He could not find spiritual fulfillment in Canada, or United States.  Mr. Warsame, like many religious Muslims, became aware of the Taliban ("students") in the mid 1990s and believed a pure Islam would rise from there.[21]  So he went to Afghanistan seeking fulfillment, based upon his "Trust in God"  (Insha-Allah).  He "supported Sharia law and believed he could live in safety from the temptations of the West in Afghanistan."[22]

    **3.**    **The Material Support**.

Separated from his wife while awaiting residency papers, having a difficult time in Canada, but finding comfort with his new religious awareness, Mr. Warsame came to see

---

[20]  Id., 18.

[21]  Id.  The United States was involved in diplomatic discussions with the Taliban at this time.  Following the takeover of Kabul by the Taliban, the State Department instructed the U.S. Embassy in Pakistan to send messages to the organization that the U.S. wished to engage the new Taliban interim government at the early stage to demonstrate the U.S.'s willingness to deal with them as the new authorities in Kabul.  U.S. Dept. Of State, Cable, "Dealing with the Taliban in Kabul," Sept. 28, 1996, Confidential, [declassified in 2003] , FOIA release to National Security Archive, "The September 11th Sourcebooks, Volume VII: The Taliban File."  This document can be found at http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB97/index.htm, document # 17.  Talks continued between the United States and Taliban.  The United States did not proceed to war against the Taliban until after the 9/11 attack.  *See*, U.S. Dept. of State, Cable, "IIR [Excised] Veteran Afghanistan Traveler's Analysis of Al Qaeda and Taliban Exploitable Weaknesses." Oct. 2, 2001, Secret, [partially declassified 2003].  FOIA release, see cite and website above, document # 28.

[22]  CIPA Summary Exh. 6, Samr Al-Barq.

Afghanistan as an Islamic utopia,[23] a place where a man could live without money.[24]  He first traveled to Pakistan and was shocked to discover how expensive it was to live there.[25]  Not only was he shocked by the expense, but also by the amount of backbreaking labor necessary to eke out a simple living.  As in Canada, things went poorly for him in Pakistan, but he still hoped he would find fulfillment in Afghanistan.

Making his way through the mountains on the way from Pakistan to Afghanistan was very difficult for this man unfamiliar with the physical demands of the *mujahedeen*.  He was not physically fit; it had been unnecessary to his life in the West.  He lagged behind the others, who waited for him.  They eventually had to help carry his luggage just so he could keep up with them.[26]  He was a soft man looking for something in a hard part of the world.

When he arrived in Afghanistan with no money, he was taken to a guesthouse in Kabul run by Saifullah Aktar.[27],[28]  Mr. Atkar asked Mr. Warsame what he was doing in Afghanistan.

---

[23]  302, 4.

[24]  Id., 2, 5, 27.

[25]  Id., 4.

[26]  302, 5.

[27]  GJ1, 33.

[28]  Qari Saifullah Atkar, a graduate of the Banuri mosque in Karachi, previously was the leader of Harkat-ul-Jihad-al-Islam, a jihadi organization which ultimately joined al Qaida. Before the U.S. invasion in 2001, Atkar was running a training camp near Rishkhur, Afghanistan. He was arrested in 2004 and turned over to the Pakistanis.  After litigation, Atkar was released in 2007.  On February 26, 2008, he was arrested again for his involvement in an assassination, but was released on March 26, 2008, for lack of evidence. http://wikipedia.org/wiki/Quari_Saifullah_Atkar

"I don't understand what your mission is here, I don't understand what your purpose for being in Afghanistan is." Mr. Warsame explained he was there to learn about the country and about the people.[29] Mr. Atkar recommended that he attend a training camp because "this was a place to stay and eat,"[30] and a place where he could learn about the people.[31] He agreed to attend the camp because he was curious.[32] He had no idea what attendance at such a camp involved.[33]

The first camp, the so-called "Strangers Camp", lasted three to five months. Located in Kabul, it was run by Abu Musab Al-Suri.[34] Mr. Warsame described Abu Musab as an "intellectual, who was educated in communism, capitalism and Islamic history." Although he was in charge of the camp, he mostly gave lectures.[35] Either right before he arrived, or right after, Mr. Aktar took Mohamed to the front so he could see the fighting.[36] It was a small

---

[29] GJ1, 34.

[30] 302, 6.

[31] GJ1, 34.

[32] 302, 19.

[33] Id., 6.

[34] Abu Musab Al-Suri (a.k.a. Mustafa Stemariam Nasar, Omar Abdel Hakim), was born in Syria in 1958 but now holds Spanish citizenship. He is considered by many as "the most articulate exponent of modern jihad and its most sophisticated strategies." He has a long history of activism. He was captured by Pakistani forces in 2005 and handed over to American custody. www.en.wikipedia.org/wiki/Mustafa_Setmariam.Nasar.

[35] 302, 6.

[36] GJ1, 36.

conflict between the Taliban backed forces versus the Northern Alliance, Ahmad Shah Masoud's forces.[37]  Masoud's forces only occupied a very small portion of Afghanistan, while the Taliban had controlled every major city since 1996.[38]  He returned to the front some time later.  He was placed in a ditch with a weapon that he never used.[39]  He tripped and fell several times and his ineptitude became widely known.[40]  Mohamed Warsame never went to the front again.  While other participants in the camp were disappointed with the lack of action, Mohamed was not anxious to be in combat, he did not want to fight,[41] and was only along for the experience.  He never completed training in Afghanistan.[42]  Mohamed was a pacifist.[43]  He was there for religious reasons.  The military side simply did not interest him.[44]

Mr. Warsame fared no better here than he had in his other life endeavors.  Training at the camp consisted of weapons training, tactics, basic explosives, topography and field movements.  Marwan Al-Jabbur, who was at this camp with Mohamed for three weeks, reports that Mohamed was not important to al Qaeda because he was lazy and had no

---

[37]  Id., 38.

[38]  Id.

[39]  302, 10.

[40]  CIPA Summary, Exh. 5, Samr Hilmi Al-Barq.

[41]  CIPA Summary, Exh. 6, Samr Hilmi Al-Barq.

[42]  Id.

[43]  GJ1, 37.

[44]  Id., 80.

initiative.[45]   The physical training at the first camp "was extremely difficult for him and he

was not physically fit."[46]   Mohamed again had a hard time keeping up.  Other people in the

camps looked down upon him as an oddball intellectual because he was not interested in jihad

or fighting;[47] he was physically week with poor eyesight[48], thick gold rimmed glasses and a

pot belly.[49]   He could barely drive because his glasses were so thick.[50]   He was regarded as

incompetent, inept, and lazy.[51]   He did not swear allegiance to anyone and he had no interest

in being a martyr[52].   Mohamed's description of the others in the camp mirror his own, "young,

immature, naive, and not sure what they're doing."[53]   Most of the men came from good

families, but they were taken advantage of and brainwashed.[54]

---

[45]   CIPA Summary, Exh. 22, Marwan Al-Jabbur.

[46]   Id.

[47]   302, 10.

[48]   CIPA Summary, Exh. 5, Samr Hilmi Al-Barq.

[49]   CIPA Summary, Exh. 19, Mohd Farik Bin Amin.

[50]   CIPA Summary, Exh. 6, Samr Hilmi Al-Barq.

[51]   CIPA Summary, Exh. 5, Samr Hilmi Al-Barq.

[52]   CIPA Summary, Exh. 4, Samr Hilmi Al-Barq.

[53]   302, 16.

[54]   Id.

The trip between Kabul and Kandahar was arduous and the second camp, the "Camp of Usama Bin Laden", was even worse than the first.[55]   The conditions were severe and Mohamed had a very difficult time.[56]   There were four areas that participants were expected to train in – weapons and tactics, navigation, field work and defensive tactics.   Those who performed well and had pure religious beliefs were sent for further, more specialized training,[57] like David Hicks, an Australian who was arrested, held at Guantanamo Bay and was one of the first to go through the Military Tribunals at the facility.[58]   Mohamed did not qualify for the specialized training.[59]   In fact, he was barely able to complete one of the four areas.   Mohamed Warsame successfully completed the land navigation course, the reading of maps, only because permission to leave the camp was predicated on the successful completion of at least one phase of his training.[60]   After only two months, Mr. Warsame repeatedly asked to leave.[61]   He was "tired", it "was getting cold" and he missed his family.

---

[55]   Id., 8.

[56]   Id., 8, 9.

[57]   GJ1, 46, 47.

[58]   See, *infra*, at p. 43-46.

[59]   302, 9

[60]   GJ1, 48; 302, 21.

[61]   302, 9-10.

During a custodial debriefing in mid-2003, Samr Hilmi al-Barq tells of Mohamed's sadness that his wife was not willing to move to Afghanistan and that he planned to return to Canada, departing by way of Pakistan.[62]  Mohamed was concerned, he had no place to stay in Pakistan and no money to stay there.[63]  Al-Barq agreed to find a place for Mohamed to stay and gave Mohamed his address and telephone number.  Al-Barq then returned home to Hyderabad, Pakistan.[64]  Mr. Warsame was not allowed to leave until he finally completed his land navigation training in October 2000.[65]

Mohamed contacted Al-Barq when he arrived in Pakistan.  Al-Barq contacted friends and asked them to put Mohamed up for a couple of weeks.  The friends were Palestinian doctors who all shared a home in Hyderabad, Pakistan.  Al-Barq told the doctors that Mohamed was only going to stay for two weeks.  During that time Mohamed, did not work, but simply stayed at the doctors' house.[66]  The two weeks turned into two months,[67] and the doctors grew tired of feeding, housing and supporting this man who did nothing.  Al-Barq spoke with Mohamed and learned Mohamed did not have enough money to leave Pakistan.  Al-Barq, the doctors and several of their associates collected money so that Mr. Warsame

---

[62]  CIPA Summary, Exh. 4, Samr Hilmi Al-Barq.

[63]  302, 16.

[64]  302, 16.

[65]  Id., 9.

[66]  CIPA Summary Exh. 4, Samr Hilmi Al-Barq.

[67]  GJ1, 59.

could buy a ticket home.  Mohamed promised to repay them.  Al-Barq claims he never did.[68]

The funds were not enough to buy a ticket to Canada.[69]

Torn between living in the fundamentalist, "altruistic", nonmaterialistic world – the Islamic utopia of Afghanistan that he had mentally created, a place in which he could survive with minimal work, with people who would support him, feed him and give him a place to sleep, against the loneliness of life without his wife and daughter, he could not decide whether to return to Afghanistan or to end this pilgrimage and go home.

If he could stay out of the camps, he would not have to endure the hard training, which he previously had found so difficult to complete.[70]  In approximately January, 2001,[71] he made his way to Kandahar, Afghanistan.[72]  He stayed at a guesthouse for several months.  He seriously contemplated returning home to Canada; Afghanistan was not the utopia he thought it would be.[73]  After the stark conditions of the camp, however, the guesthouse seemed luxurious.[74]  He worked as a guard, as did all the other guests, and he also spent time at a nearby medical clinic.  At the clinic, he brought food for the patients, an activity which "made

---

[68]  CIPA Summary Exh 4, Samr Hilmi Al-Barq.

[69]  302, 27.

[70]  GJ1, 59.

[71]  302, 28.

[72]  GJ1, 62.

[73]  302, 22, 23.

[74]  Id., 20.

him feel good as he was being helpful and peaceful."[75]  He also taught English to the staff so they could read English medical terms.  But in addition, he "spent a great deal of time at the guesthouse resting."[76]

While at the guesthouse, he had a passing acquaintance with Zacarias Moussaoui and Richard Reid, both of whom were on their way to becoming committed *jihadis*. Mr. Moussaoui and Mr. Reid were worlds apart in commitment, training, skills and temperament from the soft, lazy and notoriously inept Mohamed.  Mr. Reid was a very determined person who prayed very hard, but he was nervous and easily agitated. Mr. Moussaoui was very self-confident and did what he wanted because of his standing with the others staying at the guesthouse.  Across the street from the guesthouse was a center called the Islamic Institute.  At the institute, instructors taught a very strict version of Islam and preached *jihad* to students.  Although he went there a couple of times, Mr. Warsame was not permitted to attend the Institute[77] because he was a failure as a *jihadist* and fighter.[78]  In contrast, Mr. Moussaoui spent most of his time at the institute and was ever increasing his rank.  Although Mohammed would sometimes see Mr. Reid and Mr. Moussaoui at the clinic where he worked, he had little contact with them.[79]  Mr. Warsame was beneath them, not in

---

[75]  Id., 12, 22.

[76]  Id., 21.

[77]  Id., 11.

[78]  CIPA Summaries, Exhs. 4, 5, 14, 19, 22.

[79]  302, 30-31.

their league.  During this time, Mohamed Warsame returned to his lazy lifestyle, "he was wasting his time sitting around while others were training."[80]

Mr. Warsame approached Abu Hafs al Masri[81], the head of the Islamic Institute, seeking funds to bring his wife and daughter to Afghanistan.[82]  Abu Hafs ordered Mohamed home since his Canadian passport was about to expire.[83]  Since he had no money, he received $1,700 from the "travel department" for a plane ticket.[84]  Mohamed was ready to go home. He was disillusioned with the whole experience.

---

[80]  Id., 22.

[81]  Abu Hafs al Masri, better known as Muhammed Atef, was a devout and very quiet man.  He was involved with al Qaida since its inception and served as military commander and security chief of al Qaeda.  Following the 2000 USS Cole bombing, Atef moved to Kandahar. Atef often spoke with people who were at a significantly lower level than himself.  For example, when David Hicks completed training at al-Farouq, Atef interviewed him about his achievements and asked about the travel habits of Australians before agreeing to suggest he be moved to the Tarnak Farms training camp.  Charge sheet, *United States v. David Hicks*, ¶ 20(e) [*see*, fn.151]. Atef was killed by U.S. air strikes in November, 2001.
http://en.wikipedia.org/wiki/Mohammed_Atef

[82]  GJ1, 65.

[83]  Id., 67-68.

[84]  FBI 302,12.

4.    **Life After Afghanistan**.

By March, 2001, Mohamed had arrived in London,[85] and by April, was home in Canada.[86]  In May, 2001, Mohamed began receiving e-mails that Abu Jarrah[87] needed to talk with him about an urgent matter.[88]   Abu Jarrah was begging for money.  In June, 2001, Mohamed e-mailed Abu Jarrah putting him off, saying he would try to send him money.[89]  Finally, Mohamed, knowing of the poverty and hardship of life in Pakistan and Afghanistan, asked the mosque that he was then attending, for money to send to the poor.  Mohamed was able to gather $2,000 and sent that on to Abu Jarrah.[90] [91]  By December, Abu Jarrah was again

---

[85]  Grand Jury Exh. 5.

[86]  Grand Jury Exh. 10.

[87]  Abu Jarrah, (Adam Muhammad Sulayman) was one of the junior trainers at the Camp of The Strangers.  He taught Mohamed how to shoot a gun.  [CIPA Summary, Exh. 14].  Abu Jarrah describes Mohamed Warsame as "a serious, 'normal' person who was not dangerous, not interested in jihad, and a coward."  [CIPA Summary, Exh. 14].  By the time Jarrah began begging for money, he had lived in Pakistan for six years, had few friends and no job.  People felt sorry for him and sent him money for humanitarian reasons.  [CIPA Summary, Exh. 16, Muhammad Abdul Qadir].  According to Marwan Al-Jabbur, who knew Abu Jarrah from the camps and did not know if he was al Qaeda, was also besieged with requests for money by Abu Jarrah.  Al-Jabbur avoided him because he kept asking for money.  Abu Jarrah was neither smart nor trustworthy.  [CIPA Summary, Exh. 13].  Khalid Kilani, an acquaintance of Mr. Warsame's also sent Abu Jarrah money several times.  [302, 26; CIPA Summary, Exh. 15, Adam Muhammad Al Ma'ani].

[88]  Grand Jury Exh. 13.

[89]  Grand Jury Exh. 14.

[90]  Grand Jury Exh. 17.

[91]  GJ1, 27.

begging for more money.[92]  Others asked for money as well.  Mohamed did not send it.

Despite having post 9/11 contact with people he had met at the camps, he did nothing illegal

or contrary to United States' interests from July, 2001 onward.

In 2002, Mr. Warsame's application for residency was approved and he moved to

Minneapolis to live with his wife and daughter.  This development had a markedly beneficial

impact on his life.  He enrolled at Minneapolis Community and Technical College as a full-

time student, where he obtained good grades and was a respected member of the college

community.  He also worked twelve hours per week at MCTC in a work study program as a

tutor.[93]  Fartun was employed as a nurse and the family was able to afford an apartment and

an automobile, albeit one that did not always function.

Life was different before 9/11.  Mr. Warsame thought bin Laden was inspirational.

Mohamed believed that "the struggle between American and al Qaeda was a struggle between

two good guys, that both were good, but just had a misunderstanding."  But, Mohamed was

really shocked by 9/11 and he became disillusioned with bin Laden's methods.[94]  He was

"more innocent" and those were "more innocent" days.[95]  He never swore an oath of loyalty

---

[92]  Grand Jury Exh. 23.

[93]  GJ1, 81.

[94]  Id., 75.

[95]  302, 17.

to anyone because "that's dangerous".[96]  He never engaged in any "operations" or other activity after his return because "it's dangerous and that's not who I am."[97]

In December, 2001, Mohamed was receiving e-mails from individuals he had met in Pakistan or Afghanistan inviting him to return with them to Afghanistan.[98]  Mohamed chose not to return.

The FBI began investigating Mr. Warsame in July 2003 because it had been notified by another, undisclosed government agency that he had previously traveled to Afghanistan, where he had been in contact with members of al Qaeda.[99]  The FBI obtained his e-mail communications and his Immigration and Naturalization Services files.[100]  The FBI tapped Mr. Warsame's phones, and they conducted surreptitious searches of his apartment and his car.[101]  The FBI also conducted physical surveillance with five or six agents assigned to watch him.[102]  Surveillance commenced on July 23, 2003.  From that day until his arrest, the FBI kept careful track of Mohamed's actions, who he met, what he did.  At no point did Mohamed

---

[96]  Id., 17.

[97]  Id., 9.

[98]  Grand Jury Exh. 24, 25.

[99]  Motion Hearing Transcript, hereinafter "MH" 15-16, 77.

[100]  Id., 78, 80.

[101]  Id., 83.

[102]  MH, 82.

meet with any person, do anything, or act in any way that led the FBI to believe he was a clandestine operative on behalf of al Qaeda.[103]

The FBI, however, decided to confront Mohamed at his apartment early in the morning on December 8.  Three FBI agents appeared without warning in the hallway outside his apartment at approximately 9:00 a.m.  He was alone in the apartment, preparing to go to school because he had a tutoring appointment that day.[104]  Mohamed also had final exams that week.[105]  When he heard the knock at the front door, he thought that the maintenance people had arrived to make some repairs.[106]  Instead, he was face-to-face with three FBI agents.  They told him that they investigated international terrorism cases for the FBI.  They also told him that they were there "to discuss his background, particularly with regard to international terrorism."[107]

Mr. Warsame was taken to Camp Ripley, located approximately 100 miles from Minneapolis,[108] where the FBI also made arrangements to use two houses.[109]  The two houses were linked by a closed circuit television system so that agents in the adjacent house

---

[103] *See generally*, Surveillance logs.

[104] MH, 100.

[105] Id.

[106] Id., 22.

[107] Id., 86.

[108] Id., 114, 199.

[109] Id., 105-06.

21

could observe into the house where Mr. Warsame was placed at all times.[110]  The adjacent

house was manned by approximately eight to ten additional FBI personnel, as well as the

Assistant U.S. Attorney then assigned to his case.[111]  The closed circuit television provided

a live, contemporaneous video and audio record of everything being said and done in the

house where Mr. Warsame was placed.[112]  The government failed to preserve any record of

that encounter, a fact noted by this Court.[113]

     After lengthy questioning, the FBI formally arrested him and took him to New York,[114]

the site of the 9/11 investigation.  There he remained in custody until transferred to the

District of Minnesota based on an indictment filed on January 4, 2004, charging him with

providing material support to al Qaeda.  For the next five and one half years Mohamed

Warsame lived in a 10 x 10 foot cell in the maximum security prison at Oak Park Heights,

Minnesota.

          5.     Solitary Confinement - Oak Park Heights.

     It is the lack of living color that hurts the eyes, the stark white walls and steel colored

floors.  It is the soul-destroying loneliness that numbs the brain.  "One of the paradoxes of

solitary confinement is that, as starved as people become for companionship, the experience

---

[110]  Id.

[111]  Id., 111-12.

[112]  Id., 106.

[113]  Id.; Order on Motion to Suppress, 15, n.2.

[114]  MH 50.

typically leaves them unfit for social interaction."[115]  Craig Haney, a psychology professor at the University of California, Santa Cruz, conducted a study of 100 randomly selected inmates at California's supermax prison at Pelican Bay.  During the course of the study, Haney noticed a number of phenomena.  After months or years of complete isolation, many prisoners "begin to lose the ability to initiate behavior of any kind – to organize their own lives around activity and purpose."  "Chronic apathy, lethargy, depression, and despair often result . . . In extreme cases, prisoners may literally stop behaving," becoming essentially catatonic.[116]

In "Hellhole", Gawande compares the life experiences of imprisoned journalist Terry Anderson, who recounted in his book "Den of Lions," of his seven years as a hostage in Hezbollah, Lebanon and other individuals held in solitary confinement.  In Anderson's case, the loneliness drove him into a deep depression, as though his brain was disintegrating.[117]

> He was stiff from lying in bed day and night, yet tired all the time.  He dozed off and on constantly, sleeping twelve hours a day.  He craved activity of almost any kind.  He would watch the daylight wax and wane on the ceiling, or roaches creep slowly up the wall.  He had a Bible and tried to read, but he often found that he lacked the concentration to do so.  He observed himself becoming neurotically possessive about his little space, at times putting his life in jeopardy by flying into a rage if a guard happened to step on his bed.  He brooded incessantly, thinking

[115]  Gawande, Atul, "Annals of Human Life, Hellhole, The United States holds tens of thousands of inmates in long-term solitary confinement.  Is this torture?", *The New Yorker*, 5. www.newyorker.com/reporting/2009/03/30/090330fa_fact_gawande.

[116]  Id. 6.

[117]  Id. 2-3.

back on all of the mistakes he'd made in his life, his regrets, his offenses against God and family.[118]

In John McCain's case, he was held for five and one half years as a POW in Vietnam, two of which were in solitary confinement in a 15 x 15 foot cell: "It's an awful thing, solitary". "It crushes your spirit and weakens your resistence more effectively than any other form of mistreatment."[119]

> A U.S. Military study of almost a hundred and fifty naval aviators returned from imprisonment in Vietnam, many of whom were treated even worse than McCain, reported that they found social isolation to be as tortuous and agonizing as any physical abuse they suffered.[120]

Dr. Stuart Grassian, a board Certified Psychologist and faculty at Harvard Medical School writes of his significant experience evaluating the psychological effects of solitary confinement.

> In my opinion, solitary confinement - that is confinement of a prisoner alone in a cell for all or nearly all of the day, with minimal environmental stimulation and minimal opportunity for social interaction – can cause severe psychiatric harm.[121]

. . .

---

[118]  Id. 3.

[119]  Id.

[120]  Id.

[121]  Grassian, Stuart, "Psychiatric Effects of Solitary Confinement" 1, *Madrid v. Gomez*, 889 F.Supp. 1146 (N.D.Ca 1995).

24

> Even among inmates who do not develop overt psychological illnesses as a result of confinement in solitary, such confinement almost inevitably imposes significant psychological pain during the period of isolated confinement and often significantly impairs the inmate's capacity to adapt successfully to the broader prison environment.[122]

For Mohamed, the first year was the worst, the sensory deprivation, particularly the lack of color, was the hardest to get used to; the stark whiteness of the walls hurt his eyes. The first year was the worst because of the extreme Special Administrative Measures imposed upon him by the Department of Justice. The lack of privacy was particularly difficult for Mr. Warsame, an observant Muslim. The lights in the hallway remained on twenty-four hours per day. There was no privacy. The toilet and shower, which were adjacent to his cell, were open for anyone who passed the door to see.

He was given a television, but prohibited from watching any news programs. He only had access to limited channels and had no access to NPR or other news radio stations. He had only the Koran to read and had no access to any other library books. His contact with his wife and daughter was monitored, and was via closed circuit camera. Fartun was not able to visit often given the distance between Oak Park Heights and her home. In succeeding years, he was allowed to watch the news and listen to the news channels on the radio, but the social isolation was tortuous and agonizing.

Much of his life those five and one half years was spent on his bed. He began to show the effects of this isolation with apathy, lethargy and depression. He rarely left his cell to

---

[122] Id.

exercise in the locked cell adjacent to his own cell, something he would have been allowed to do one hour per day.  He never took advantage of the Court's order permitting him to walk in the yard of the prison while accompanied by an FBI agent.  It took too much effort.  All saw the effects of this isolation when this man, who for almost all of the five and one half years quietly and politely responded to the Court's questions in court, had an uncharacteristic outburst at one of his last court appearances.  The social isolation has been tortuous and agonizing.  The effects will be long term.

B.     **The Need for the Sentence Imposed**.

This existence, living in a 10 x 10 foot box for 23 hours per day for 67 months -- 2,095 days, 48,185 hours of looking at the same stark white walls, the mind-numbing isolation, is the paradigm of doing "hard time".  This Court has previously considered "hard time" reductions for defendants serving lengthy periods of pretrial detention at the Sherburne or Anoka County Jails.  Imprisonment in these jails cannot compare to the extreme conditions under which Mohamed Warsame has spent the last five and a half years.  While they may have the same white walls and steel flooring, there is human interaction for most of the day, the color of personalities, human touch, laughter, and commiseration easing somewhat the burden of imprisonment.  It is the soul-destroying loneliness that turns his pretrial detention from difficult to extreme.  Every day of this wrenching existence was more than twice as hard to get through than every day at the Sherburne County Jail.  These harsh conditions warrant credit of two days for every one day Mohamed served – which would put him at 134 months

time served.  In *United States v. Noriega*, 40 F.Supp.2d 1378, 1380-81 (S.D. Fla. 1999), Judge

Hoeveler reduced former Panamanian Dictator Manuel Noriega's sentence from 40 to 30

years based upon the nature of his confinement.  Despite that Noriega was not being held in

solitary confinement, Judge Hoeveler held that because Noriega was "denied in large part, the

company of others". . . [t]here is little question that this is a more difficult ('harder') type of

confinement than in general population."  *Id*. at 1380.

The government seeks a sentence of 150 months.  Under ordinary circumstances, an

inmate serving a 150 month term without incident earns sufficient good-time credit to reduce

the sentence to a 127-month term.  By all accounts, Mohamed has been a model inmate, never

violating disciplinary rules.  He has not been disrespectful to any guard or prison official.  He

has earned good-time credit.  The amount of time he has previously served after crediting for

"hard time" and reduction for "good time", exceeds 127 months.  He has served the sentence

the government seeks and additional time in custody furthers no legitimate purpose.

In addition, the Canadian Consulate has met with Mohamed,[123] and has confirmed his

Canadian citizenship.  According to Estelle Arnaud-Battandier, Canadian Consular Affairs

Officer, if Mr. Warsame is sentenced to time served, she is prepared to write the required

letter authorizing his entry into Canada.    It will take her ten minutes to complete.

---

[123]  Contrary to assertions made to CBC News "Ottawa not saying if Canadian linked to al-Qaeda can return," June 15, 2009, www.cbc.ca/canada/ottawa/story/2009/06/15/warsame-trial-canada569.html, Canadian officials have paid Mr. Warsame regular visits throughout the five and one half years he has been in pretrial detention.  The person claiming to speak on Mr. Warsame's behalf has never spoken with Mr. Warsame and is not his attorney in the district court case.

Ms. Arnaud-Battandier has already forwarded to Mohamed a packet of information regarding the John Howard Society, a Canadian organization that will assist him in finding housing and employment, and she will be present at his sentencing hearing.

### C.   The Kinds of Sentences Available.

If the Court were to impose an additional period of incarceration, no matter what the Court recommends, it will be up to the Bureau of Prisons to designate the facility. Mohamed will most likely be designated to the Communications Management Unit at FCI Terre Haute.

### 1.   FCI Terre Haute Communications Management Unit.

The Bureau established the Communications Management Unit (CMU) at FCC Terre Haute, IN, to house inmates who, "due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communications with persons in the community."[124]  The types of inmates who may be housed there include those:

> *    convicted of, or associated with, international or domestic terrorism;
>
> *    convicted sex offenders who repeatedly attempt to contact their victims;
>
> *    who attempted to coordinate illegal activities while incarcerated via approved communication methods; and

---

[124]  State of the Bureau 2007, Bureau of Prisons Staff: Everyday Heroes, U.S. Department of Justice, Federal Bureau of Prisons, 15.

> \*      those who have received extensive disciplinary
> actions due to their continued misuse/abuse of
> approved communication methods.[125]

The CMU does not allow contact visits, and a CMU inmate is only entitled to four hours of

visits per month.[126]  Yasser Aref, an inmate who served time in the CMU, wrote a book about

the conditions.

> The Government claims this is just an ordinary unit in a medium
> security prison with the only difference involving
> communication.  They brought a couple of non-Muslims here
> (still foreigners though) so whenever someone criticizes the
> government and says that it is against the law to discriminate
> based on race or religion, the government will say, "It's not just
> for Muslims, there are Christians here too."  It is the same with
> Arabs, there are a few non-Arabs here.[127]
>
>                                    . . .
>
> All our visits, even with family, must be through glass.  Stopping
> me from hugging my baby has nothing to do with national
> security!  Again, if it's really a security concern let them give us
> non-contact visits for friends.  But family, especially children
> under 10, have nothing to do with threats.  Even if the people
> here were a danger (which I don't believe, at least in most cases)
> there are thousands of criminals, even murderers, in medium
> security prisons like this.  But they are all allowed contact visits
> every day, not 4 hours a month and through the glass.  The law

---

[125]  Id.

[126]  Institution Supplement, U.S. Department of Justice, Federal Bureau of Prisons,
Federal Correctional Complex, Visiting Regulations, # THX-5267.08B, July 3, 2007, 4.

[127]  Aref, Yassin, Dead Life, Inside out and upside down: Life at the "Communication
Management Unit" of Terre Haute Federal Prison, 7, http://www.albanyweblog.com/2007/10-
Oct/10-14-07.html.

should be the same and all should have the same privileges. The only difference is that we are Muslims.[128]

. . .

This summer when the temperature was above 90 degrees, it was like we were living in an oven because there was no air conditioning. I was happy winter was coming so we would be okay for a couple months, but when I spoke with others who were here last winter, they told me that when that happens you will wish it was summer again and accept, even prefer hell over this place in winter. I asked why and they said because the whole entire roof leaks, . . . in many cells you spend most of the day bailing the water out so it doesn't fill up. I thought they were joking, but when it rained last week I saw myself that the roof started leaking. When I told them now I knew they weren't joking, they laughed and said just wait till the snow comes! . . .

Even worse, we are under a threat every day. When we complain about something or ask why they don't move us somewhere else until they fix this building, they answer there is no other place except the ADX. [The Administrative Maximum or Super max prison in Florence, Colorado, where inmates are subjected to sensory deprivation, kept in solitary and continuously deprived of all human contact, slowly driving them insane]. They say they can't put us in any ordinary unit. So we constantly hear that if we don't like it here we can always go to the ADX. Also, if we get in trouble and get a disciplinary ticket, there is always the threat that we will be transferred to the ADX.[129]

Whether as a direct result or otherwise, some time after Yassin Aref wrote the article about the CMU, he was transferred to USP Marion.[130]

---

[128]  Id. 6.

[129]  Id. 9.

[130]  www.bop.gov.

30

2.    **ADX Florence.**

The Bureau of Prisons operates an Administrative Maximum Facility (ADX) in Florence, Colorado.  Because of the nature of Mr. Warsame's conviction and because of the Special Administrative Measures still in place that control the conditions of his confinement, he could be designated to ADX Florence to serve his sentence.  Former Warden Robert Hood described ADX Florence as a "clean version of hell."[131]  Among the inmates housed at ADX are Zacarias Moussaoui, Fed. Reg. No. 51427-054, Jose Padilla, Fed. Reg. No. 20796-424, Richard Reid, Fed. Reg. No. 24079-038[132], and John Walker Lindh.[133]

**D.    The Advisory Guideline Range**.

The guideline range in this case is 180 months, the statutory maximum.  The base offense level for an offense under §2339B (conspiring to provide material support to a designated foreign terrorist organization) is 26.  Under U.S.S.G. § 3A1.4(a), the base offense level is increased by twelve levels because the offense involves terrorist activity.  That provision also increases the criminal history category to VI.  With a reduction for acceptance of responsibility, the guideline range would be 235 to 293 months, but because that range

---

[131]  60 Minutes: Supermax: A Clean Version of Hell (CBS television broadcast Oct. 14, 2007(available at  http://www.cbsnews.com/stories/2007/10/11/60minutes/main3357727. shtml?source=RSS attr=60Minutes_3357727.

[132]  www.bop.gov.

[133]  Lindh's name does not appear on the BOP website.  However, *See*, "American Taliban John Walker Lindh Transferred to 'Supermax' Prison", April 12, 2007. www.ktvu.com/news.117516571.detail.html

exceeds what Congress believed was reasonable for the most egregious of these types of cases, the guideline range is the statutory maximum of 180 months.

### 1.   Minimal Role Pursuant To U.S.S.G. § 3B1.2.

Section 3B1.2 provides for a four level downward adjustment for a defendant's role in the offense if the defendant is less culpable than most other participants. *United States v. Godinez*, 474 F.3d 1039, 1042 (8th Cir. 2007). In order to make this determination, the Court must compare Mr. Warsame's acts and relative culpability to those of the other participants. *United States v. Johnson*, 408 F.3d 535, 538-39 (8th Cir. 2005).

> The appropriate test for whether a reduction is appropriate is to compare the acts of the defendant "in relation to the relevant conduct for which the participant is held accountable" and measure "each participant's individual acts and relative culpability against the elements of the offense."

*Godinez*, 474 F.3d at 1042-43.

Mr. Warsame pled guilty to conspiring with others to provide material support to al Qaeda in violation of 18 U.S.C. § 2339B. In comparing Mr. Warsame's conduct to others, it is clear that there is a range of activities, some more nefarious than others, that qualify as material support. In Mr. Warsame's case, and in that of the Lackawanna Six,[134] the material support consisted of traveling to Pakistan and Afghanistan to attend training camps run by al Qaeda. There are, however, far more serious cases involving violent acts in support of al Qaeda. For example, in *Khadr v. United States*, 529 F.3d 1112, 1114 (D.C. Cir. 2008), Khadr

---

[134] Mukhtar Al-Bakri, Sahim Alwan, Faysal Galab, Shafal Mosed, Yaseinn Taher, Yahya Goba,

was charged with, among other offenses, with providing material support to al Qaeda under the Military Commissions Act of 2006.  Khadr is alleged to have murdered U.S. Sgt. First Class Christopher Speer on or about July 27, 2002, by throwing a hand grenade at U.S. forces.  In addition, he converted land mines into improvised explosive devices and  planted them in the pathways of U.S. coalition forces.

In *United States v. Abu Ali*, 528 F.3d 210, 262 (4th Cir. 2008), Ali was also charged with providing material support to al Qaeda.  Soon after arriving in Saudi Arabia in September, 2002, Ali joined an al Qaeda cell with the intent to inflict massive civilian casualties on American soil.  He pledged to engage in *jihad* against the United States.  He participated in planning several plots, including the assassination of the president, destroying airliners destined for the United States.  His efforts were aimed at civilian targets in the United States.

Mohamed Warsame does not stand on equal grounds with Khadr, Abu Ali or many other defendants convicted of providing material support to al Qaeda.  He was not a planner nor a doer, he was not involved in operations, he never swore an oath to al Qaeda.  The degree of harm contemplated by Khadr, Abu Ali, Zacarias Moussaoui, Richard Reid, Jose Padilla and others is far broader in scope and more devastating in terms of potential impact than anything Mohamed did.  A four level reduction under §3B1.2 is more than appropriate.

2.    **Downward Departure As Terrorism Enhancement Overstates Offense and Criminal History**.

While Mohamed sent money to al Qaeda, he also knew that like him, there were many idealistic Muslims living in extreme poverty in Pakistan and Afghanistan. Other than sending money and teaching English, the government has offered no evidence of any sinister motive on Mohamed's part. He was a young, impressionable Muslim who had recently committed to Islam. The government seeks a twelve level increase to the base offense level and an increase from criminal history category I to category VI under U.S.S.G. 3A1.4. However, Mr. Warsame's conduct is distinguishable from the conduct of others who have received §3A1.4 terrorism enhancement. *See, e.g. United States v. Garey*, 483 F.3d 1159 (11ᵗʰ Cir. 2007)(terrorism enhancement given because defendant threatened to bomb and cause mass destruction to various local businesses)[135]; *United States v. Mandhai*, 375 F.3d 1243 (11ᵗʰ Cir. 2004)(enhancement given for plan to blow up electrical sites in United States and demand Muslim prisoners be released and government change in Middle East policy); *United States v. Jordi*, 418 F.3d 1212 (11ᵗʰ Cir. 2005)(enhancement for plot to destroy abortion clinics); *United States v. Hale*, 448 F.3d 971 (7ᵗʰ Cir. 2006)(enhancement for plot to murder federal judge); *United States v. Harris*, 434 F.3d 767 (5ᵗʰ Cir. 2005)(enhancement for destroying municipal building through use of Molotov cocktail); *United States v. Dowell*, 430 F.2d 1100 (10ᵗʰ Cir. 2005)(enhancement for setting fire to IRS building); *United States v. Graham*, 327

---

[135]   The Eleventh Circuit granted rehearing *en banc* and vacated this opinion due to an issue unrelated to the terrorism enhancement. *United States v. Garey*, 496 F.3d 1189 (11ᵗʰ Cir. 2007).

34

F.3d 460 (6th Cir. 2003)(enhancement for active member of the North American Militia, a paramilitary organization that planned a "first strike" in which they would attack and destroy various transportation, communication, and energy sources, kill certain federal officials); *United States v. Meskini*, 319 F.3d 88 (2[d] Cir. 2003)(enhancement for plot to bomb Los Angeles airport); *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93 (2d Cir. 2008)(enhancement for bombing embassies on behalf of terrorist organization).

Mr. Warsame's conduct differs significantly from the conduct described in these reported cases where the sentencing court applied the §3A1.4 enhancement.  In these cases, the terrorist activity involved using force and violence against innocent people.  By contrast, there is no evidence that Mr. Warsame ever sought to harm any person.  Without the §3A1.4 enhancement, Mr. Warsame's guideline range is 46 to 57 months.

> **2.    *Kimbrough, Gall, Spears and Deconstructing §3A1.4*.**

In *Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 558, 560 (2007), the United States Supreme Court held that "under *Booker*, the cocaine Guidelines, like all other Guidelines, are advisory only."  *Kimbrough, Gall* and *Spears* unequivocally make clear that while sentencing courts must look at the Guidelines, judges "may vary from Guideline ranges based solely on policy considerations including disagreements with the Guidelines." *Kimbrough*, 128 S.Ct. at 570.  The Court held that it would not be an abuse of discretion for the District Court to conclude, given the lack of careful deliberation in formulating the 100

to 1 crack/powder ratio, that the sentence is "greater than necessary" to achieve §3553(a)'s purpose, "*even in a mine-run case.*" *Id*. at 563.

Like the crack guidelines at issue in *Kimbrough*, the § 3A1.4 adjustment does not appear to be the product of careful deliberation based upon an empirical approach. *See* U.S.S.G. App. C, Amendment 526 (authorizing twelve-level adjustment and shift to criminal history category six under § 3A1.4 and providing no reason or explanation as to why Commission chose this particular increase.)  As stated in the amendment, § 120004 of the Violent Crime Control and Law Enforcement Act of 1994 directs the Commission to provide an appropriate enhancement for any felony that involves or promotes international terrorism. This amendment replaced the upward departure provision of § 5K2.15 (if the defendant committed the offense in furtherance of a terroristic action, the Court may increase above guideline range). *See,* Amendment 526.  Under the pre-1995 guideline provision of § 5K2.15, the District Court determined the extent if any, of the departure warranted for the magnitude of the criminal behavior.  With the replaced provision § 3A1.4, the District Court has no discretion to weigh the extent of the enhancement against the extent of the behavior.  This enhancement is not based upon an empirical approach.

In *Kimbrough*, the Supreme Court affirmatively recognizes that Congress makes mistakes, and that when the Commission blindly follows or exacerbates a congressional mistake with guidelines that are not based on empirical evidence or experience, and that are contrary to sentencing purposes and/or create unwarranted disparities or unwarranted

36

similarities, the courts are free to reject such guidelines.  *Kimbrough*, 128 S.Ct. at 567-68, 569 n.2, 571-72, 574-75; *Gall*, 128 S.Ct. at 594 & n.2.

Based on the history and circumstances of Mr. Warsame, a sentence within the sentencing range is unreasonable, unjust and unsupported by "empirical data and national experience", and it "does not exemplify the Commission's exercise of its characteristic institutional role."  Id. at 575.  *Kimbrough* clearly permits this Court to conclude when sentencing Mr. Warsame that the § 3A1.4 enhancement "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes."  Id.

E.     **The Need to Avoid Unwarranted Sentencing Disparities**.

The government believes that anyone who associated with al Qaeda, in whatever capacity, merits a prison sentence at or near the maximum allowed.  But the government's theory makes no allowance for different roles played by the individuals involved.  There are differences between associates, foot soldiers and leaders.  Other courts have recognized those differences; this Court must join other courts in realistically assessing the roles played and how those differences must be addressed in this sentencing decision.

Mr. Warsame pled guilty to conspiring to provide material support to al Qaeda.  In examining persons convicted of committing terrorist-type offenses, it is clear that Mohamed falls on the least egregious spectrum of offenders.

37

1.  **Salim Ahmed Hamdan - 66 Months Imprisonment**.

Salim Ahmed Hamdan, born in 1970, is a Yemeni citizen.[136]   In November 2001, during hostilities between the United States and the Taliban, who then governed Afghanistan, Hamdan was captured by militia forces and turned over to the United States military.  In June 2002, he was transported to Guantanamo Bay.[137]   A year later President Bush declared Hamdan eligible for trial by military commission for "then-unspecified crimes".  After another year passed, Hamdan was charged with one count of conspiracy "to commit . . . offenses triable by military commission."[138]

As stated in relevant part in the original charging document:

  a. In 1996, Hamdan met Usama bin Laden in Qandahar, Afghanistan and ultimately became a bodyguard and personal driver for Usama bin Laden.  Hamdan served in this capacity until his capture in November of 2001.  Based on his contact with Usama bin Laden and members or associates of al Qaida during this period, Hamdan believed that Usama bin Laden and his associates were involved in the attacks on the U.S. Embassies in Kenya and Tanzania in August 1998, the attack on the USS Cole in October 2000, and the attacks on the United States on September 11, 2001.

  b. From 1996 through 2001, Hamdan:

---

[136]  Mahler, Jonathan (2006-01-08) "The Bush Administration vs. Salim Handan". *New York Times*.

[137]  *Hamdan v. Rumsfeld*, 548 U.S. 557, 566, 126 S.Ct. 2749, 2759 (2006).

[138]  Id..

1)     delivered weapons, ammunition or other supplies to al Qaida members and associates;

2)     picked up weapons at Taliban warehouses for al Qaida use and delivered them directly to Saif al Adel, the head of al Qaida's security committee, in Qandahar, Afghanistan;

3)     purchased or ensured that Toyota Hi Lux trucks were available for use by the Usama bin Laden bodyguard unit tasked with protecting and providing physical security for Usam bin Laden; and

4)     served as a driver for Usama bin Laden and other high ranking al Qaida members and associates.  At the time of the al Qaida sponsored attacks on the U.S. Embassies in Tanzania and Kenya in August of 1998, and the attacks on the United States on September 11, 2001, Hamdan served as a driver in a convoy of three to nine vehicles in which Usama bin Laden and others were transported to various areas in Afghanistan. Such convoys were utilized to ensure the safety of Usama bin Laden and the others. Bodyguards in these convoys were armed with Kalishnikov rifles, rocket propelled grenades, hand-held radios and handguns.

c.    On diverse occasions between 1996 and November 2001, Hamdan drove or accompanied Usama bin Laden to various al Qaida-sponsored training camps, press conferences, or lectures.  During these trips, Usama bin Laden would give speeches in which he would encourage others to conduct "martyr missions" (meaning an attack wherein one would kill himself as well as the targets of the attack) against the Americans, to engage in war

against the Americans, and to drive the"infidels" out of
the Arabian Peninsula.

d.   Between 1996 and November 2001, Hamdan, on diverse
occasions received training on rifles, handguns and
machine guns at the al Qaida-sponsored al Farouq camp
in Afghanistan.[139]

Hamdan challenged prosecution by military commission, which ultimately resulted in

the Supreme Court finding that the military commission lacked power to proceed in the

prosecution of Hamdan, it violated the Geneva Convention and[140] the charge of conspiracy

was not a cognizable offense against the laws of war.[141]

In the mean time, one of the Combatant Status Review Tribunals convened to

determine whether Hamdan was an enemy combatant.  A Summary of Evidence memo was

prepared for the tribunal, listing the alleged facts that led to his detention.[142]  The memo

accused Hamdan in relevant part, of serving as a personal driver to Usama Bin Laden both

before and after the September 11, 2001 attacks.  As a personal bodyguard to bin Laden,

Hamdan was armed with a weapon.  As a driver and bodyguard, Hamdan gained a substantial

amount of knowledge about al Qaida operations and came in contact with some very highly-

---

[139]  Charge Sheet, *United States v. Salim Ahmed Hamdan*, 3; see also, *Hamdan*, at
570, 126 S.Ct. at 2761.

[140]  Id. at 567, 126 S.Ct. at 2759-60.

[141]  Id. at 600-601, 126 S.Ct. at 2779-80.

[142]  OARDEC (16 September 2004).  "Summary of Evidence for combatant Status
Review Tribunal – Hamdan, Salim Ahmed Salim".  United States Department of Defense, 48.

placed al Qaida officials including Abu Hafs, Saif Al Adel and Abu Zabaydah.  When Hamdan was captured in a vehicle by Northern Alliance forces near Kandahar, he was in possession of weapons.[143]

After the Supreme Court delivered its opinion, Congress passed the Military Commissions Act of 2006.  In the interim, Hamdan tried to work out a deal for a ten-year term of imprisonment, but that offer was rejected by the prosecution.[144]  The charges against Hamdan were expanded from mere conspiracy to include a charge of providing support for terrorism, and on December 21, 2007, the Combatant Status Review Tribunal ruled that Hamdan was an "illegal enemy combatant", who would be tried by a military commission.

Hamdan's trial began on July 21, 2008.  During trial, the prosecution attempted to portray Hamdan as a hardened al Qaeda warrior.  The jury of six military officers, convicted him of supporting al Qaeda by driving and guarding bin Laden and ferrying weapons for the terror group.  At the time of sentencing, prosecutors sought a 30-year term of imprisonment. The military jury, unconvinced that Hamdan was anything more than a low-level al Qaeda figure, returned with a sentence of 66 months, a mere six months longer than the 61 months he had already served.[145]

---

[143]  Id.

[144]  White, Josh and Branigan, William (2008-11-25) "Hamdan To Be Sent To Yemen". *The Washington Post*.

[145]  Id.

Unlike Hamdan, Mohammed was never tasked with carrying out sensitive activities such as delivering weapons, purchasing equipment or being around operatives planning an attack.  Mohamed's material support consisted of sending approximately $2,000 to an al Qaeda member in Pakistan and teaching English to a couple of hospital personnel.

### 2.      Lynne Stewart - 28 Months Imprisonment.

On February 10, 2005, after a lengthy trial, a jury found Lynne Stewart guilty of all counts of the superceding indictment charging her in Count 1 with conspiracy to defraud the United States; Count 4 with conspiracy to provide and conceal material support to be used in preparation of the conspiracy charged in Count 2 – murdering persons in a foreign country; Count 5, the substantive count of providing and concealing material support to the conspiracy charged in Count 2; Counts 6 & 7 with making false statements.

The indictment alleged that from June 1997 through April 2002, Stewart, Sheikh Omar Abdel Rahman and others named and unnamed conspired to defraud the United States by obstructing the Department of Justice and the Bureau of Prisons in the administration and enforcement of the Special Administrative Measures ("SAM's") applicable to inmate Sheikh Abdel Rahman.

In his Opinion & Order, Judge Koeltl found, in response to Stewart's motion for judgment of acquittal, that a rational jury could find that Stewart and her co-defendants knew of the existence of the SAMs severely limiting Abdel Rahman's ability to communicate with others, and violated the SAMs by smuggling messages to and from Abdel Rahman.  One such

42

message smuggled to Abdel Rahman questioned whether he wished to withdraw support of a cease fire.  Under the cease fire, the cell had suspended terrorist operations in Egypt in an effort to persuade the Egyptian government to release cell leaders, members and associates who were in prison in Egypt.  The judge found that a jury could reasonably find that Stewart disseminated his statements to the media announcing Abdel Rahman's withdrawal of support of the cease-fire,[146] hence calling for a resumption of terrorist operations.[147]

Prior to one of Stewart's visits to Abdel Rahman, co-defendant Sattar had received a letter from two individuals who requested an opinion from Abdel Rahman whether the group should form a political party in Egypt.  It was found that this information was relayed to Abdel Rahman by Stewart during one of the attorney/client visits.[148]

During another visit, it was found that Stewart smuggled into the facility a letter from Abdel Rahman's son which the interpreter covertly read to Abdel Rahman.  During this same visit, the interpreter told Abdel Rahman that the U.S.S. Cole had been bombed on Abdel Rahman's behalf.[149]

The transfer of information between Abdel Rahman and "The Islamic Group" had international consequences, far exceeding the mere presence in Afghanistan teaching English

---

[146] Opinion & Order, *United States v. Sattar, et al.*, S1 02 cr. 395 (JGK)(S.D.N.Y. October 24, 2005), 8-9.

[147] Id., 10.

[148] Id.

[149] Opinion & Order, 16-17.

43

to a couple of al Qaeda medical personnel.  At sentencing, the government argued for a 30-year term of imprisonment.  The District Court imposed a sentence of 28 months.

3.      **David Hicks - 9 Months Imprisonment (84 Months with 75 Months Stayed)**.

David Hicks, nicknamed the "Australian Taliban" is an Australian native who was detained by the United States at Guantanamo Bay.  In March, 2007, the government released a charge sheet against Hicks setting forth the allegations of conspiracy, attempting murder by an unprivileged belligerent, and aiding the enemy.  The overt acts set forth in the conspiracy charge are as follows:

     a.     On or about January 2001, Hicks, with funding and a letter of introduction provided by LET [a terrorist organization known as Lashkar e Tayyiba], traveled to Afghanistan to attend al Qaida terrorist training camps. Upon arriving in Afghanistan, Hicks went to an al Qaida guest house, where he met Ibn Sheikh al Libi, a top-ranking al Qaida member, and others.  Hicks turned in his passport and indicated that he would use the *kunya*, or alias, "Muhammed Dawood."

     b.     Hicks then traveled to and trained at al Qaida's al Farouq camp located outside Qandahar, Afghanistan.  In al Qaida's eight-week basic training course, Hicks trained in weapons familiarization and firing, land mines, tactics, topography, field movements, and basic explosives.

     c.     On or about April 2001, Hicks returned to al Farouq and trained in al Qaida's guerilla warfare and mountain tactics training course.  This seven-week course included: marksmanship; small team tactics; ambush; camouflage; rendezvous techniques; and techniques to pass intelligence to al Qaida operatives.

d.     While Hicks was training at al Farouq, Usama bin Laden visited the camp on several occasions.  During one visit, Hicks questioned bin Laden regarding the lack of English al Qaida training material; accepting bin Laden's advice, Hicks began to translate the training camp materials from Arabic to English.

e.     After Hicks completed his first two al Qaida training courses, Muhammad Atef. . . then the military commander of al Qaida, summoned and interviewed Hicks about his background and the travel habits of Australians. . . At the conclusion of this meeting, Muhammed Atef recommended Hicks for attendance at al Qaida's urban tactics training course at Tarnak Farm.

f.     On or about June 2001, Hicks traveled to Tarnak Farm and participated in this course.  A mock city was located inside the camp, where trainees were taught how to fight in an urban environment.   Training also included: marksmanship; use of assault and sniper rifles; rappelling; kidnaping techniques; and assassination methods.

g.     On or about August 2001, Hicks participated in an advanced al Qaida course on information collection and surveillance in an apartment in Kabul, Afghanistan.  This course included "practical application" where Hicks and others conducted surveillance of various targets in Kaul, including the U.S. and British embassies and submitted reports.

h.     Following the information collection and surveillance course, Muhammed Atef again interviewed Hicks, and asked if he would be willing to undertake a "martyr mission", meaning an attack wherein Hicks would kill himself as well as the targets of the attack.

i.     At an al Qaida guest house in Qandahar, as well as at al Qaida training camps and other locations in Afghanistan, Hicks received instruction from al Qaida associates on

their interpretation of Islam, the meaning and obligations of *jihad*, and other topics.

j.    On or about early September 2001, Hicks traveled to Pakistan to visit a friend. After watching television footage of the September 11, 2001 attacks on the United States, Hicks returned to Afghanistan to rejoin his al Qaida associates.

k.    Arriving in Qandahar, Afghanistan, Hicks reported to Saif al Adel, who was assigning individuals to locations where they were to fight alongside other al Qaida associates against U.S. and Coalition forces. Give a choice of three different locations, Hicks chose to join a group of al Qaida fighters near Qandahar Airport. Armed with an AK-47 automatic rifle, ammunition, and grenades, Hicks traveled with his al Qaida associates to the Qandahar Airport.

l.    On or about October 2001, after Coalition bombing operations commenced, Hicks joined an armed group outside the airport, where they guarded a Taliban tank.

m.    After guarding the tank for approximately one week, Hicks, still armed with the AK-47 rifle, ammunition, and grenades, traveled with an LET acquaintance to Konduz, Afghanistan, arriving around November 9, 2001. There, he joined others, including John Walker Lindh, who were engaged in combat against Coalition forces.[150]

He was also charged with attempting to murder diverse persons by "directing small arms fire, explosives, and other means intended to kill American, British, Canadian, Australian, Afghan, and other Coalition forces, while he did not have combat immunity.[151]

---

[150] *United States v. David Mathew Hicks*, charge sheet which can be found at www.defenselink.mil/news/d20070301hicks.pd.

[151] Id.

46

On March 26, 2007, Hicks entered a guilty plea to the charge of material support. Unlike Mr. Warsame, who barely completed one course on map reading, David Hicks received advanced, specialized training in weaponry, explosives, kidnaping, sniper shooting and other extremely violent specialities. On March 31, 2007, a United States military tribunal imposed a 7-year prison sentence but suspended all but nine months of that sentence.[152] Hicks has since returned to Australia.

### 4.   Mohamad Kamal Elzahabi - Time Served (44 Months).

Mohamad Kamal Elzahabi was charged in a Superceding Indictment with various counts of making false statements and possession of fraudulent immigration documents. Ezahabi proceeded to trial on Counts 3, 4 and 5; Counts 1 and 2 having been severed prior to trial. The jury convicted on all three counts. On March 14, 2008, Elzahabi appeared for sentencing. At the time, the government sought an upward departure claiming Elzahabi was a terrorist and "has admitted to serious acts of terrorism and violence, . . ."[153] The government sets forth at length Elzahabi's terrorist activities as provided below:

> [He] has been identified both by his own admission and by third-party sources as a terrorist trainer and well-known sniper. Beginning on April 16, 2004, Elzahabi participated in 17 days of voluntary debriefings with special agents of the FBI. In the course of his statements to the FBI, Elzahabi admitted to two trips to Afghanistan, to serving as a sniper against the Russians and providing training at Khalden Camp, to knowing and

---

[152]  www.npr.org/templates/story.php?storyID=9248761.

[153]  Position of the United States with Respect to Sentencing, *United States v. Mohamad Kamal Elzahabi*, Crim. No. 04-282 (JRT/FLN), 2.

working with Abu Zubeydah and Abu Musab al Zarqawi, to providing training to Bassam Janj's group and other fighters in Lebanon, and to traveling to Chechnya and serving as a sniper there, where he admitted to shooting at least one Russian solder. It is also believed that he functioned as a repacker and reshipper to Abdullah Al-Malki, an al Qaeda procurement official, when living in New York in approximately 1995-96, and that he assisted Ri'ad Hijazi, now convicted and imprisoned in Jordan for his role in the failed Millennium plot to destroy tourist sites and hotels in the Middle East, to obtain a driver's licence, when they both lived in Massachusetts in 1997.

During the course of the FBI interview, Elzahabi admitted fighting with and training armed Islamic groups in Afghanistan, training the armed Islamic group the Al-Dinnayyah Rebels in Lebanon, and fighting in Chechnya. Specifically, Elzahabi admitted that, in early 2000, he delivered nearly $300,000 to the leaders of a Chechen terrorist group and that he fought with them as a sniper against Russian forces. Elzahabi admitted having personal contact with both Ibn Khattab and Shamil Besayev, leaders of the Checken liberation movement, who have committed numerous acts of terrorism in and around Russia. Finally, Elzahabi admitted taking part in multiple ambushes of Russian solders and, in his role as a sniper, shooting and killing specific Russian soldiers.

In addition, as set out in an affidavit a copy of which has been submitted to probation, Elzahabi has been identified by an individual associated with al Qaeda (CS-1) as a very well-known sniper who assisted in the teaching of sniper skills at an assassination course run at an al Qaeda training camp located in Afghanistan. Another individual (CS-2), also associated with al Qaeda, identified Elzahabi as a jihad fighter in Afghanistan during 1990-1992, who suffered serious wounds in combat. This individual understood that Elzahabi had also been in combat in Lebanon's civil war. . . In short, Elzahabi has a long history of activities as a *jihadi* and terrorist.[154]

---

[154] Id. 2-4.

The allegations by the government -- actual, specific and exceedingly violent *jihadi* activities - - are in stark contrast to the ineffectual, lazy, half-blind man named Mohamed, who could not hit the broad side of a barn. This Court sentenced Elzahabi to time served, which constituted a sentence of approximately 44 months.

### 5.      Jose Padilla - 208 Months.

The most egregious charge and conviction against Jose Padilla is conspiracy to murder, maim and kidnap persons overseas in violation of 18 U.S.C. § 956(a)(1). Padilla was tasked by his al Qaeda handlers to use explosives to destroy apartment buildings in the United States. He completed the intensive training in Afghanistan necessary to effect his task, including explosives training. In contrast, Mohamed Warsame learned to read a map. The government sought a sentence of life.[155] Padilla was sentenced to a 208-month term of imprisonment.[156] The Fifth Superceding indictment alleged as follows:

> It was a purpose and object of the conspiracy to advance violent jihad, including supporting and participating in armed confrontations in specific locations outside the United States, and committing acts of murder, kidnaping and maiming, for the purpose of opposing existing governments. . .

As set forth in the government's brief in *Padilla v. Hanft*, 545 U.S. 1123, 125 S.Ct. 2906 (2005):

---

[155]  Government's Sentencing Memorandum and Response to Defendant's Objections to the Presentence Investigation Reports, 1; *United States v. Jassoun, Jayyousi, Padilla*, 04-cr-60001-MGC, document 1280, Entered on FLSD Docket 11/29/2007.

[156]  FLSD Docket, *United States v. Padilla*, 04-60001-MGC.

In 2001, Mohamed Atef, a senior al Qaeda operative, asked petitioner to undertake a mission to blow up apartment buildings in the United States. Rapp Decl. para. 11. Petitioner agreed to the mission and received further training from an al Qaeda explosives expert. *Ibid.*

When the United States commenced combat operations against the Taliban and al Qaeda, petitioner and other al Qaeda operatives moved from safehouse to safehouse in Afghanistan to avoid bombing or capture, and later began moving towards Afghanistan's mountainous border with Pakistan in order to evade United States forces and air strikes. Rapp Decl. para. 10. Armed with an assault rifle, petitioner took cover with other operatives in a network of caves and bunkers near Khowst, Afghanistan, and was eventually escorted into Pakistan by Taliban personnel. *Ibid.*

Soon after entering Pakistan, petitioner met with senior Osama bin Laden lieutenant Abu Zubaydah to discuss the possibility of conducting terrorist operations in the United States. Rapp Decl. para. 10. Zubaydah sent petitioner to Karachi, Pakistan, to meet with Khalid Sheikh Mohammad (KSM), al Qaeda's operations leader. *Id.* para. 12. KSM suggested that petitioner revive the plan to detonate apartment buildings, as petitioner had initially discussed with Atef. *Ibid.* Petitioner accepted the assignment, and KSM gave him full authority to conduct the operation. *Ibid.* Before departing for the United States, petitioner received training from Ramzi Bin al-Shibh, a senior al Qaeda operative, on the secure use of telephones and e-mail protocols. *Ibid.* A1 Qaeda operatives also gave petitioner $15,000, travel documents, a cell phone, and an e-mail address to notify al Qaeda facilitator Ammar al-Baluchi upon arrival in the United States. *Ibid.*

On May 8, 2002, petitioner flew from Zurich, Switzerland, to Chicago's O'Hare International Airport, where he was detained and arrested in the customs inspection area pursuant to a material witness warrant. Petitioner had been monitored by FBI agents in the Zurich airport and on the plane. Stipulations of Fact paras. 3, 6, 10. Petitioner was carrying $10,526 in currency, the cell

50

phone that he had been given, and the e-mail address that he was
to use to update al-Baluchi. Rapp Dech para. 13.[157]

In contrast to Padilla, Mohamed was never assigned or accepted any assignment to

conduct terrorist attacks in Canada, the United States or anywhere else.  The facts are actually

to the contrary.  Padilla personally met with Al Qaeda's operational manager Khalid Shaikh

Muhammad.  During a custodial interview, Shaikh Muhamad was shown a photograph of

Mohamed Warsame and not only had Shaikh Muhammad never seen Mohamed Warsame, but

had never even heard of him.[158]

### 7.    John Walker Lindh - 240 Months.

John Walker Lindh, born on February 9, 1981, was captured as an enemy combatant

during the Battle of Qala-i-Jangi, a violent Taliban prison uprising where American CIA

officer Johnny "Mike" Spann was killed.

> On November 24, a bright, warm Saturday, 300 Taliban soldiers
> who had fled the American bombardment of Kunduz, their last
> stronghold in the north of Afghanistan, laid down their weapons
> in the desert a few miles north of Mazar-i-Sharif.   They
> surrendered to Northern Alliance General Abdul Rashid
> Dostrum, who crowed that his forces had achieved a "great
> victory" as the POWs were herded 50 at a time onto flatbed
> trucks.[159]

---

[157]  Appellate's Petition, Motion, and Filing, 3-4, *Padilla v. Hanft,* 2005 WL 1112138,
*4-*5 (May 9, 2005).

[158]  CIPA Summary, Exh. 9, Khalid Shaikh Muhammad.

[159]  "Inside the Battle of Qala-I-Jangi" TIME, 1.  This document can be found at
www.time.com/time/nation/article//0,8599,186592,00.html.

Things went wrong almost immediately.  Once inside Qala-i-Jangi, a 19th century prison, the prisoners were individually searched.  As the alliance commander approached one of the prisoners, the prisoner pulled out and detonated a grenade, killing himself and the commander.[160]  The next day, two American CIA agents began interviewing the inmates, but did so *en masse* rather than individually.  They asked the inmates who they were and why had they joined the Taliban.  John Walker Lindh was questioned by the officers.  As shown on British Channel 4 news, Spann asked Lindh many questions, one of which was, "Are you a member of the IRA?"  Lindh refused to answer.  Soon thereafter, the prisoners massed around the two men.  "'Why are you here,' Spann asked one. 'To kill you,' came the reply."  The inmate attacked Spann.  Spann drew his gun, the other agent grabbed an AK-47 and the battle began.[161]  The battle raged through the week.

> By Monday morning the Alliance had established a new command post at the northeast tower on top of what an American commander described as "10 tons of munitions, rockets, mortars, the works."  A tank was driven onto the tower.  From his seat on the garrison roof, commander Mohammed Akbar guided mortar and tank fire to Taliban positions in the southwest.  "Excellent-- right on the nose!" he shouted, as bullets from Taliban snipers whizzed just over his head. . .[162]

By Tuesday, the Taliban forces were beginning to flag, but they persisted in their fight as best they could.

---

[160] Id.

[161] Id.

[162] Id., 2.

Even in the heat of battle, warriors can be rational; few fight to
the death.  But the Taliban at Qala-i-Jangi truly did, and beyond
it.  Spann's body, recovered by a special-operations squad, had
been booby-trapped; a grenade had been hidden under the corpse
of a Taliban fighter that lay on top of the American.  As late as
Thursday, those removing bodies were still taking fire from
Taliban fighters who had somehow survived in the basements
underneath the fort.  On Saturday the basements were flooded;
Northern Alliance observers expected perhaps five or six
surviving Taliban to come out.  In fact, at 11 a.m. no fewer than
86 filthy and hungry prisoners emerged; . . .[163]

John Walker Lindh, the "American Taliban", was one of those surviving Taliban soldiers.

On February 5, 2002, Lindh was indicted by a federal grand jury on ten charges:

Count1 - conspiracy to murder U.S. citizens or U.S. nationals; Counts 2 and 4 - conspiracy

to provide material support to a designated foreign terrorist organization; Counts 3 and 5 -

providing material support; Count 6 - conspiracy to contribute services to al Qaeda; Count 7 -

contributing services to al Qaeda; Count 8 - conspiracy to supply services to the Taliban;

Count 9 - supplying services to the Taliban; and Count 10 - using and carrying firearms and

destructive devices during crimes of violence.[164]

---

[163] Id., 4.

[164] Indictment, *United States v. John Phillip Walker Lindh*.  This document can be found
at www.usdoj.gov/ag/2ndindictment.htm.

In the face of a life sentence,[165] Lindh and the government reached a plea agreement. On July 15, 2002, Lindh pled guilty to supporting the Taliban and using a firearm or explosive device during a crime of violence.  He received a twenty-year term of imprisonment.

John Lindh made a conscious decision to arm himself with grenades and guns, to fight in Afghanistan with the Taliban and al Qaeda, still supporting the *jihadi* cause, even after 9/11.  He was present when a CIA officer was murdered and he continued to resist.  In contrast, Mr. Warsame grew disillusioned with the cause and left the region well before 9/11 and the United States' declaration of war on the Taliban.

One must also remember that Lindh was sentenced just one year after the horrific attacks of 9/11 when the wounds were still fresh, emotions high and fear abounded.

### 8.     Richard Reid - Life.

> The man who admitted to trying to blow up a U.S. jetliner with explosives in his shoes was wrestled out of a courtroom by federal marshals Thursday after a federal judge sentenced him to life.  As he was dragged out of the courtroom, Richard Reid began yelling at Judge William Young, repeating his allegiance to Osama Bin Laden.[166]

---

[165] *See*, 18 U.S.C. § 2332(b).

[166] CNN.com, "Exchange between Reid, judge follows life sentence", http://www.cnn.com2003/LAW/01/30/shoebomber.sentencing.

Richard Reid, like Jose Padilla, had been sent on a specific mission by Khaled Shaikh Mohamed, Al Qaeda's operations manager.[167]

Passengers on flight 63 complained of a smoke smell in the cabin shortly after a meal service.  One flight attendant walked the aisles of the plane trying to assess the source.  She found Reid, who was sitting alone near a window, trying to light a match.  Following a struggle, Reid was subdued and restrained.  Upon examination, it was discovered that each of his ankle-high hiking shoes contained a sophisticated explosive device designed to destroy the plane.  Reid was subsequently tried and sentenced to life in prison.  During the sentencing hearing, Reid declared himself an enemy of the United States and an Islamic fundamentalist with allegiance to al Qaeda and Osama bin Laden.[168]

While Reid was learning the fine points of assembling and igniting shoes containing powerful and deadly explosives, Mr. Warsame was ensconced in Minneapolis attending school and getting to know his wife.

### 9.    Zacarias Moussaoui - Life

Zacarias Moussaoui, born in France on May 30, 1968, was convicted among other violent offenses, of conspiring to kill citizens of the United States as part of the September 11, 2001, terrorist attacks.  It all began in London, 1992.  Moussaoui became involved in

---

[167]  Ressa, Maria. "Sources: Reid is al Qaeda operative."  http://www.cnn.com/2003/ WORLD/asiapcf/01/03/reid.alqaeda.

[168]  In addition to attempting to blow up an airliner, Reid was also involved in scouting missions in Israel and Egypt, including the train station in Tel Aviv.  Government's Sentencing Memorandum, *United States v. Reid*, Crim. No. 02-10013-WGY, 6.

radical Islam after being influenced by Abu Qatada (who has been called the leader of al-Qaeda in Europe).[169]  On December 11, 2001, he was charged in a six-count indictment with conspiracy to 1) commit acts of terrorism transcending national boundaries; 2) commit aircraft piracy; 3) destroy aircraft; 4) use weapons of mass destruction; 5) murder United States Employees; and 6) destroy property.[170]  The government sought the death penalty.  The jury rejected death and imposed life.

Over defense counsel objection, Moussaoui pled guilty to all charges and laid the following factual basis:

> . . .I came to the United States of America to be part, okay, of a conspiracy to use airplane as a weapon of mass destruction, I was being trained on the 747 400 to eventually use this plane as stated

> in this statement of fact to strike the White House, but this conspiracy was a different conspiracy than 9/11.

> My conspiracy has for aim to free Sheikh Omar Abdel Rahman, Sheik Omar Abdel Rahman, the blind sheikh, who is held in Florence, Colorado, okay, and we wanted to use the 747 because it, it is a long-distance plane who could reach Afghanistan without any stopover to give a chance to special forces to storm the plane.

---

[169]  Profile: Zacarias Moussaoui, 2. Cites to various news articles.  Entire profile can be found at http://historycommons.org/entity.jsp?entity=zacarias_moussaoui.

[170]  *United States v. Zacarias Moussaoui*.  This document can be found at http://www.usdoj.ag/moussaouiindictment.html.

> So I am guilty of a broad conspiracy to use weapon of mass
> destruction to hit the White House if the American government
> refuse to negotiate, okay.[171], [172]

It hardly seems necessary to compare their relative culpability.  Moussaoui intended to blow up innocent citizens.  Mohamed sent money to an acquaintance.

There are differences between associates, foot soldiers and leaders.  Other courts have recognized those differences; this Court must join other courts in realistically assessing the roles played and how those differences must be addressed in this sentencing decision.

Mohamed falls on the least egregious spectrum of offenders.  But unlike Hamdan, he was never thought capable of carrying out sensitive activities.  He taught the English words for various body parts and asked his mosque for money, which he sent to an acquaintance in Pakistan.  Unlike Stewart's actions, Mohamed's support did not have the result of lifting a cease fire on international terrorist activities.  He never became a capable and dangerous fighter like David Hicks, nor did he return to Afghanistan after 9/11.  Mohamed was never present when a CIA agent was murdered, nor did he spend extensive time on the front waging

---

[171] Transcript of plea hearing, *United States v. Zacarias Moussaoui*, Crim. No. 01-455-A, April 22, 2005, 28-29.  A link to this document is available at www.cnn.com/2005/law/04/28/dorf.moussaoui/index.html.

[172] Moussaoui was driven to Minnesota from Oklahoma on August 10, 2001 in order to attend flight school at the Pan-Am International Flight Academy.  On August 16, 2001, he was arrested by the FBI and INS and charged with an immigration violation.  He was ultimately charged in the United States District Court for the Eastern District of Virginia on December 11, 2001.  During the five days that Moussaoui was in Minneapolis, Mr. Warsame was in Toronto, Canada and did not move to Minneapolis until 2002, well after Moussaoui's arrest and transfer to Virginia.

war like John Lindh.  Mohamed Warame's level of culpability cannot even compare to those who were sent on direct missions by Khalid Shaikh Muhammad, such as the bombing of apartment buildings for Jose Padilla, or the blowing up of an airliner by Richard Reid.  He was not a sophisticated killer  capable of taking out a person from hundreds of feet away like Mohamad Elzahabi, nor did he intend to fly a plane into the White House like Zacarias Moussaoui.

Mohamed Warsame has served 67 months in solitary confinement for his offense of providing material support to al Qaeda.  He falls on the least egregious scale of terrorist offenders and a sentence of 67 months imprisonment, time served, is not a sentence that would create an unwarranted sentencing disparity.

**III.    The Appropriate Sentence in this Case**

Mohammed Warsame was a believer in the possibility of the Islamist eschatology.  He shared a millennialist vision of a world in which the sick were healed, the hungry fed and the homeless housed.  He left his home and the comforts of his life in the West to advance this dream, to take part in what he saw as a world changing movement.  Mohamed Warsame believed that devotion to Islam was the answer to the world's horrors and that the light would emanate first from Afghanistan and then encompass the world.  He uncritically believed that Afghanistan was being transformed into a land the world had not seen since the Abbassid Caliphate, a land of transcendent Islamic purity, a land where a man's piety would be the measure of that man's value.  What he found upon his arrival in Pakistan should have been

58

a warning.  But by the time of his arrival, Mohamed Warsame could not be dissuaded that his dream was possible if not imminent.

Mohammed Warsame, in the first instance, ignored the signs that much more was afoot than simple piety; the weapons training, the visit to the front, the hard men gathering.  He ignored them when they laughed at his softness, when they remarked on his inability to wield a weapon or complete a basic course of military training.  Mohammed Warsame believed that piety and studiousness would be his part in the bringing about the new world; the sweat belonged to others.

There came a time, however, where it became so apparent that his vision of the new Islamic world was different than that embraced by the other men who had traveled to Afghanistan.  There came a time when Mohammed Warsame had to acknowledge that the utopia that he had envisioned, that the Islamic paradise that he sought was usurped by men who wrapped their piety in bandoliers and announced their faith with explosives.  Realizing the bankruptcy of his vision, he left Afghanistan and made his way back to the West.  He borrowed money and repaid it.  That was his assistance to these men.

Mohammed Warsame is no terrorist.  He has never been a terrorist.  Mohammed Warsame is a naive, near sighted, and overweight idealist who wanted to be a part of something larger than himself, a man without direction who sought direction for his life in the mountains of Afghanistan.  He has acted out his belief and now stands before the Court to be sentenced for the crime he has admitted to as he sought out his dream.

Mr. Warsame respectfully asks the Court for a sentence that recognizes that his involvement in this activity has long been over, and that, if nothing else, he has been forced by this matter, to make the transition from naif to adulthood.

Mr. Warsame is not the same man who appeared before the Magistrate Judge over five years ago. He knows well that he will never escape the watchful eye and abiding interest of the federal government's varied and various law enforcement agencies. Mr. Warsame recognizes that there are challenges facing him because of his involvement in all of this. The collateral consequences of this conviction are certain but remain largely undefined. What is known is that Mr. Warsame's life is irrevocably changed.

Mr. Warsame does have the support, love and respect of his community and his family, particularly his wife. And it is well settled that familial support is an absolute necessity to the successful avoidance of new criminal activity. As Mr. Warsame ages, he is confident that he can overcome this part of his life. He is hopeful and optimistic, respectfully asking the Court to recognize that individuals change and, sometimes, it takes a shocking or traumatic event to effect that change.

And what of punishment? For that is as necessary a part of the sentencing analysis to be undertaken by the Court as the examination of Mr. Warsame's life and can surely not be omitted from the calculus of sentencing. Mr. Warsame broke the law. He must be punished for his transgressions lest it lead to contempt for the law; this is, after all, quite a serious offense. Mr. Warsame most assuredly, recognizes the seriousness of this offense. He has

lived with this offense since it began and will, without question, deal with the consequences, both actual and collateral for the rest of his life.

Accordingly, Mr. Warsame respectfully asks that he be sentenced to time served. This is a sentence which recognizes the extraordinary circumstance of this case, reflects his culpability and punishes him for the crime of which he stands convicted. Such a sentence constitutes a just punishment that is sufficient but not greater than necessary to effect the statutory purposes of criminal sentencing.

Dated:  July 2, 2009                         Respectfully submitted,

                                             *s/ Andrea K. George*

                                             _____
                                             ANDREA K. GEORGE
                                             Attorney No. 202125
                                             Office of the Federal Defender
                                             107 U.S. Courthouse
                                             300 South Fourth Street
                                             Minneapolis, MN 55415

                                             DAVID C. THOMAS
                                             Law Offices of David C. Thomas
                                             53 West Jackson Blvd., Suite 1362
                                             Chicago, IL   60604

                                             Attorneys for Mohamed Abdullah Warsame