UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CRIMINAL NO. 04-29 (JRT/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S POSITION WITH |
| | ) | RESPECT TO SENTENCING |
| v. | ) | |
| | ) | |
| MOHAMED ABDULLAH WARSAME, | ) | |
| | ) | |
| Defendant. | ) | |

## **Introduction**

The United States of America, by and through its attorneys Frank J. MaGill, Jr., United States Attorney for the District of Minnesota, Assistant United States Attorney W. Anders Folk, and Trial Attorney Joseph N. Kaster, hereby submits this Position with Respect to Sentencing in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Guidelines Manual ("Guidelines")) § 6A1.2, and in anticipation of the sentencing hearing in this case scheduled for July 9, 2009.

The Defendant has pleaded guilty to conspiring, over a period of several years, to provide material support and resources to al-Qaeda. During this time, Warsame traveled to Afghanistan where he received military training from al Qaeda at two training camps. Upon returning home, Warsame maintained communications with al Qaeda fighters from those camps and sent money back to Pakistan to support them. Warsame persevered in this conduct notwithstanding the events of September 11th and his knowledge that al Qaeda was responsible for terrorist attacks worldwide that have killed

thousands of innocent persons.  The probation office has correctly computed the Defendant's guideline range to be 180 months imprisonment.  For the reasons set forth below and as provided in the plea agreement, the United States respectfully recommends that the Court sentence the Defendant to a term of 150 months imprisonment.

## **Factual Background**

In March 2000, the Defendant Mohamed Warsame left Toronto, Canada, and traveled to Afghanistan.  Over the next several months, he received military training at two terrorist training camps and worked under the direction and control of al Qaeda leadership to support the terrorist group.  Throughout his travels, the defendant used two aliases: Abu Suhayla and Abu Maryam.

### *First Terrorist Training Camp: (Spring-Summer 2000)*

After leaving Canada, Warsame arrived in Karachi, Pakistan, and sought out a way to enter Afghanistan.  Warsame then illegally crossed the border into Afghanistan by walking over a mountain pass with a group of other men journeying there for jihad.  Prior to attending the first camp, Warsame visited the front line fighting between the Taliban and the Northern Alliance forces.  Warsame then began training at military camp for al Qaeda and other terrorists located near Kabul, Afghanistan.  The camp was known as the "Stranger's Camp" or the "Camp of Abu Musab" after its leader, Abu Musab Al-Suri.  For approximately five months, Warsame trained

2

alongside dozens of jihadists from other countries. Warsame received training in physical fitness, the use of weapons, and martial-arts. Abu Musab, who Warsame admired as an intellectual, was well-known for his lectures on Islamic history, the evils of Western society, and the path of jihad against the unbelievers. Warsame later told agents that Islam needs to be defended, if necessary, with a person's money or life. While at the camp, Warsame came to know a camp commander who taught martial arts, Abu Jarrah, and later corresponded with Jarrah after Warsame returned to Canada. The Defendant described how at this camp he and his fellow trainees were restless for action and wanted to fight.

### Second Terrorist Training Camp: Camp of Usama bin Laden (al Faruq) (Summer - Fall 2000)

In the mountainous terrain outside Kandahar, Afghanistan, Warsame attended a second terrorist training camp. This camp was known to Warsame as the "Camp of Usama bin Laden" it was also called "al Faruq" by other attendees. At the time the Defendant attended, al Faruq was largest training camp for Usama bin Laden and al Qaeda. Prior to admittance, Warsame was interviewed and his passport was examined by al Qaeda leadership. Jihadists from all over the world made their way to the Camp of Usama bin Laden. Warsame frequently saw Bin Laden himself at the camp, lecturing or even eating with the trainees. In fact, Warsame himself sat next to Bin Laden and shared a meal. Warsame later declared to F.B.I. agents that he found Bin Laden very inspirational.

The Defendant received additional military training at this second camp. Warsame told agents that training at this camp was even more demanding and difficult than that at Abu Musab's camp. Warsame received training on a variety of skills required by al Qaeda: physical fitness/martial arts, use of AK-47 rifles, Uzis and other weapons, tactics, and navigation. Warsame was aware others received specialized training at this camp and another one near Kabul that focused on explosives, poisons, passport forgery, and suicide missions/bombings, although Warsame claims he did not participate in any advanced classes.

During his tenure at this second camp, Warsame again traveled to the Taliban front line. On this occasion, Warsame fought for the Taliban and experienced heavy fighting between the Taliban and the Northern Alliance. While at the front, he carried an AK-47 and was assigned to a reserve position in the event the enemy broke through the Taliban's lines. Apart from receiving training, Warsame also provided assistance to al Qaeda by using his language skills to translate Arabic instruction into English for lectures to camp attendees on guns and navigation.

### Travel to and within Pakistan (Fall - Winter 2000)

Warsame sought permission from a camp instructor for temporary leave. Warsame hoped to rest at a guesthouse in Kandahar before returning to the camp. Receiving permission to leave, Warsame stayed at a guesthouse in Kandahar and then traveled to Pakistan.

4

While in Pakistan, the Defendant lived with university students who were assisting al Qaeda by providing other jihadists a place to stay in Pakistan.  The Defendant stayed with a man that he had met earlier while in Afghanistan at the first training camp he attended.

Once in Pakistan, Warsame communicated via email with a variety of individuals, including his wife, friends in Canada and co-conspirators whom he met while in Afghanistan.  In early October 2000, for example, Warsame wrote to one of his friends in Canada: "..[I] am doing fine and have arrived safely from 'The Great Land' [i.e., Afghanistan] I spend nearly the whole of the summer there[.] [I]t was one of the greatest experiences of my life.  I will be going back there very soon."  In the same email, Warsame asked for money to have an eye operation to allow him to operate more effectively in Afghanistan:

> As you know all my money is over and I am in urgent need of money as soon as possible.  I need at least 800 to 1000 u.s. dollars because I want to do an eye operation that is laser treatment so that I don't have to wear glasses any more.  As you know that when I return to the great land it will help me very much to not depend on glasses especially for the kind of stuff we do there.

Approximately four days later, Warsame informed the same friend that "I went to the hospital today to make a checkup of my eyes and made an appointment for Wednesday."  After receiving money, Warsame discussed his friend's possible travel to Pakistan and Afghanistan,

writing

> [b]rother you said that you are coming to
> pakistan: When are you coming so that I will
> be ready to recieve [sic] you.  We can discuss
> about "The Great Land" and all about the
> latest activities there.  It is better to see
> each other (sic) face to face to discuss these
> things.

While in Pakistan, Warsame expressed his desire to return to Afghanistan.  In an email sent on October 16, 2000, Warsame inquired of another associate: "When are you and [name omitted] going to come and leave kuffar countries you know it is haraam to stay over there.  Alhamdullilah life is very good over here."[1]  By December 2000, Warsame instructs another jihadist: "[b]rother, if you have any news or important information please let me know, because I don't want to be late for the action, you know what I mean.  We hear there might be an attack soon."

In late December 2000, Warsame had planned to move his family from Minneapolis to Afghanistan.  Warsame wrote of his plans for the future:

> Brother I would like to inform you of some
> good news.  As you know I have been trying to
> talk to my family for some time now of making
> hijra and coming to join me.  Alhamdullilah my
> wife has sent me a message that she has
> finally agreed to coming here from America
> where she lives.
>
> Unfortunately I dont [sic] much money and I

---

[1]  *Kuffar* translates as "non-believer;" *Haram* translates as "forbidden;" *Alhamdulliah* translates as "praise to God."

> dont know what I should do.  On monday I
> should be getting the money that you sent me
> since due to the eid holidays I was unable to
> get the money.

The Defendant explained the importance of removing his family from the United States drives Warsame's desire to re-locate them to Afghanistan:

> Brother this is a unique opportunity for me to
> save my family from the clutches of the kuffar
> especially since I also have a young daughter
> who is almost 3 years old.

But ultimately, as events unfolded, Warsame did not move his family to Afghanistan, and he ultimately returned home to Canada instead.

### *Jihadist Guesthouse and Clinic: (Winter-Spring 2001)*

Following a few months in Pakistan, the Defendant returned to Afghanistan and to the al Qaeda guesthouse in approximately January 2001.  The Defendant told agents that the guesthouse was to provide people attending Bin Laden's camp a place to rest.  The Defendant worked at the guesthouse as a guard, where his duties included, among other things, searching potential guests' luggage to ensure the security of the organization.  Across from the guesthouse, there was an Islamic institute and a clinic.  The institute taught a very radical form of Islam, and Warsame went there more than once, although he claimed he was not allowed to attend on a regular basis.  At the guesthouse, Warsame met several individuals who were subsequently convicted, or sought by law enforcement, for a variety of terrorism-related offenses in the United States and abroad, such

as Zacarias Moussaui and Richard Reid.

Located near the guesthouse where the Defendant worked as a guard was a medical clinic.  In order to work at the clinic, one needed a recommendation from another jihadist who could vouch for a prospective attendee based on an individual's ideological purity. The head of the clinic asked Warsame to teach English to the clinic's staff, which he did.  The clinic's students received medical training to treat fellow jihadists.  In one situation, Warsame observed a goat being shot so that students could learn how to remove bullets from a body.  On another occasion, Warsame met a jihadist taken to the clinic who was injured in an explosion at bin Laden's camp.

**Al Qaeda sends Warsame back to the West: (Spring 2001)**

The Defendant also explained to agents that there was an Islamic Institute across the street from the guesthouse.  The Defendant knew the leader of this institute by name, Abu Hafs al Masri (a/k/a Mohammed Atef), and knew that he was a high ranking member of al Qaeda.  During early 2001, Warsame approached Atef for money to bring his family from Canada to Afghanistan.  Upon receiving this request, Atef examined Warsame's Canadian passport and told Warsame he instead should return to Canada.  The Defendant explained that when he made this request, Atef told the Defendant that because the Defendant's passport was due to expire, the Defendant should leave Afghanistan so that he was not "stuck."  The

8

Defendant explained to agents that Atef valued the Defendant's passport because it made it easier for the Defendant to enter western countries.[2]

Warsame believed that Atef did not want Warsame to apply for a renewal of his passport while in Pakistan because this would draw attention to Warsame when he returned to Canada.  Atef directed al Qaeda's travel department to provide Warsame with $1700 cash and a plane ticket to return home.

### *Warsame maintains his conspiratorial relationship with fellow jihadists: (Spring 2001 - Fall 2003)*

Despite initially denying to the FBI that he maintained contact with any individuals from the training camps, Warsame ultimately admitted that he in fact continued his relationship with these fellow jihadists.  Immediately after leaving Afghanistan and Pakistan, for example, Warsame spent two weeks in London.  In London he met up with a man he knew from the Islamic institute in Afghanistan.

Using aliases, multiple accounts, and coded language, Warsame maintained communication with several men he knew from the training camps.  On March 29, 2001, for example, the Defendant received an email from one of the individuals from Afghanistan, which read in part: "[C]ould you send me please, the cassetes [sic] that I talked

---

[2] While in Afghanistan, Warsame was asked to conduct operations in Western countries, but Warsame claims he denied this request.

with you about to this adress [sic]: [London address omitted]."
Two days later, in an email dated March 31, 2001, the Defendant
received a second related email where Warsame is instructed on how
to contact the sender: "You can call me on this number [London
phone number omitted].  I've got an apartment I'm alone so you can
join me.  Don't use anymore my name ok! or br!"

Warsame's associate from the institute was very concerned
about returning to Canada.  Consequently, Warsame and he discussed
what "tricks" to use to get back into Canada.  After arriving in
Canada from London, Warsame wrote in April 2001 to this individual:

> Thanks to Allah i have reached safely in
> canada.  There is no stamp on the passport
> from london.  In Canada I was asked lots of
> questions like how come you went for a year
> and all that.  and also they are afraid of mad
> cow disease and they check the bags and spray
> something on your shoes so be careful.[3]

In May, 2001, as the Defendant's immigration status in the
United States appeared to be moving forward successfully, the
Defendant wrote a friend to see if he could get any information
regarding the process.  Specifically, the Defendant asked: "What
should [I] expect in the interview like what kind of questions? and
is it hard?"

Jihadists from the camps communicated with Warsame about the
situation in Afghanistan and requested his assistance, "[e]veryone

---

[3]  Warsame later saw this individual on CNN as wanted by the
U.S. Government.

sends you their regards and all the men are doing well," in this email, the Defendant was also informed that Jarrah from the al Qaeda camp "wants the phone number to call you about an urgent matter[.]" Warsame responded: "I can speak to the other brothers who might give some money. Allah willing I am planning to go to America and work over there[.] Allah willing, if i get a good job I will try to help [the camp commander]." And then, shortly later, Warsame told Jarrah: "Concerning the issue you spoke to me about, thanks be to Allah, I spoke to some of the brothers and they told me, Allah willing, they will try to send you some money for the sake of Allah." In emails on June 9, and July 1, 2001, the Defendant was provided with account information for a bank in Pakistan by two of his co-conspirators. The account information was provided to the Defendant so he would know where to direct the money on behalf of his co-conspirators. Warsame subsequently sent the money ($2000 Canadian) to a bank account in Pakistan and received an email from his camp commander thanking him for the money.

The Defendant's communication with his co-conspirators from his time in the al Qaeda camps continued as the Defendant was getting ready to leave Canada for the United States. In an August 21, 2001, email, the Defendant wrote his camp commander, telling him,

> Beloved brother, I have a very important subject and am drawing near. i need your

prayers especially for this issue.  As I told
you before, I will travel to America and have
requested papers for this purpose.

Even after September 11, 2001, Warsame maintained his

relationships with the co-conspirators from his time in

Afghanistan.  For example, approximately six weeks after the 9/11

attacks, on October 26, 2001, the Defendant wrote one of his former

camp commanders, in part,

How are you?  Brother you probably know the
situation here and the people changed after
the events of last month What is your security
situation there?  What is the situation with
the brothers?  First and foremost, could you
assure me that you are [commander's name
omitted]?  Could you mention the name of the
school where we both were?  I mean the name of
the school or anything that assures me that
this is you, [commander's name omitted].

Warsame received a request back from his commander in December

2001.  Jarrah wrote the Defendant seeking assistance for families

of men who were killed in Afghanistan.  The email, sent on December

12, 2001 reads in part:

To my dear brother abu Maryam I will start
this letter with the saying May God help
Listen, brother, neglect is on the rise and
problems are increasing.  We must be ready to
solve these problems.  Many of the families
came now and here and you do know what this
means.   There are many families that must
travel to their countries and there are (4)
families who must travel as soon as possible.
The men of some of those families [got
married], I mean the women lost their husbands
and may God help.  Listen, beloved brother We
must make every effort for this and I think
you understand what I am saying very well and
as soon as possible . . . I want replies to

these questions as soon as possible . . . Concerning the expenses, every family needs approximately (1500 to 1000) American dollars I want you and [Defendant's friend from Canada who had been in Afghanistan at the same time as Defendant] to assist each other on this issue (the situation is difficult, Abu Maryam) Your brother [commander's name].

The Defendant also received a request from the co-conspirator he spent time with in London after the Defendant left Afghanistan. On December 31, 2001, this co-conspirator asked the Defendant to pass messages to other individuals:

How are you Abu Maryam, [t]his is [co-conspirator's name omitted]. I hope that you will write us to this e-mail [email address omitted]. I want a favor from you: Call brother they call FATHI on this number in Montreal [telephone number omitted] and tell him: Raouf and his friend are doing fine, thanks be to Allah. Let him call us on this e-mail [co-conspirator's email address]. Tell him to send us the news of the brothers in Montreal and to give this e-mail to TAXI DRIVER, to SNAKE, and to CROCODILE. Peace be upon you

In January 2002, the Defendant wrote his associate from the institute, with whom he had spent time in London,

Peace be upon you and Allah's mercy and blessings[.] How are you Sheikh? What is new with you? Brother, i want to help you in Allah but you know about the danger and you know that they caught [Zacarias Moussaoui] What is new with you? What is the security situation? Allah bless you, [friend's name omitted]. I had planed (sic) to visit you again in your city during Ramadan. How was Ramadan? How was the feast? Peace be upon you and Allah's mercy and blessings My nickname now is abu zaynab

13

Using three separate email accounts, Warsame regularly logged in to check for messages from individuals he knew from the training camps, passed messages among them, and received updates about their status in Afghanistan and elsewhere.  While living in Minnesota in 2003, the defendant repeatedly checked the email accounts he used to communicate with his jihadi co-conspirators from a variety of locations outside his home, despite having internet access at home. Even in December 2003, when he was being interviewed by the FBI, Warsame could not help but ask the agents about the fates of his associates from Afghanistan.

## Argument

**Based on the applicable Guidelines range and the factors of 18 U.S.C. § 3553(a), the Court should impose a sentence of 150 months imprisonment.**

**A.   Post-*Booker*, a district court should apply a three-step sentencing procedure.**

In the aftermath of Supreme Court's decision in *United States* v. *Booker*, 543 U.S. 220 (2005), the Eighth Circuit has held that district courts should follow the general sentencing procedures outlined by the Second Circuit in *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  *See United States v. Haack*, 403 F.3d 997, 1002 (8th Cir. 2005).  In *Crosby*, the Second Circuit explained that, as a result of the *Booker* decision, a district court must engage in a three-step sentencing procedure.

First, the court must determine the applicable Sentencing

14

Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. *United States* v. *Garcia*, 413 F.3d 201, 220 (2nd Cir. 2005). The Eighth Circuit has held that "we see nothing in *Booker* that would require the court to determine the sentence in any manner other than the way the sentence would have been determined pre-*Booker*." *Haack*, 403 F.3d at 1003; *United States v. Garcia*, 413 F.3d 201, 220 (2nd Cir. 2005) ("Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives *Booker*."). Moreover, "'the sentencing court [is] entitled to rely on any type of information known to it when determining an appropriate sentence.'" *United States* v. *Granik*, 386 F.3d 404, 414, n.7 (2nd Cir. 2004)(internal quotations and citation omitted).

The second step of the post-*Booker* sentencing process is for the district court to consider whether a departure from the Guidelines range is appropriate. *Haack,* 403 F.3d at 1002 (*citing Crosby*, 397 F.3d at 112).

Third, the sentencing court must consider the advisory Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 1002; *see Booker*, 543 U.S. at 245-46. Title 18, United States Code, Section

15

3553(a) provides that the "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) and then sets forth in pertinent part as follows:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed-
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D)  to  provide  the  defendant  with  needed educational  or  vocational  training,  medical  care,  or other  correctional  treatment  in  the  most  effective manner;
>
> (3)  the kinds of sentences available;
>
> (4)  the kinds of sentence and the sentencing range established for-
>
> (A)  the  applicable  category  of  offense committed by the applicable category of defendant as set forth in the guidelines-
>
> . . . .
>
> (5)  any pertinent policy statement . . . issued by the Sentencing Commission . . . .
>
> (6)  the  need  to  avoid  unwarranted  sentence disparities  among  defendants  with  similar  records  who have been found guilty of similar conduct . . . .

Although  the  Sentencing  Guidelines  are  no  longer  mandatory, they nevertheless continue to play a critical role in trying to

16

achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *Booker*, 543 U.S. at 252. Thus, the Second Circuit has instructed district judges to consider the Guidelines "faithfully" in sentencing, *Crosby*, 397 F.3d at 114, and has held that the applicable Guidelines range is "a benchmark or a point of reference or departure" for a district court considering what sentence to impose on a defendant. *United States* v. *Rubenstein*, 403 F.3d 93, 99 (2nd Cir.), *cert. denied*, 126 S. Ct. 388 (2005). Likewise, the Eighth Circuit has stated that a district court's discretion in departing from the Guidelines' range is not unlimited: "[R]easonableness as constraint on a district court's discretion to depart downward infers a limited range of choice." *Haack*, 403 F.3d at 1004.

Because the Guidelines continue to represent a benchmark, in "the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable." *United States* v. *Fernandez*, 443 F.3d 19, 27 (2nd Cir. 2006). This is unsurprising, given that the Guidelines reflect the "accumulated wisdom and experience of the Judicial Branch." *Mistretta* v. *United States*, 488 U.S. 361, 412 (1989).

**B.    The Pre-Sentence Report has correctly determined the applicable guideline range in this case.**

The United States has reviewed the presentence investigation

report prepared by the Probation Office for the District of Minnesota. Based on this review, the United States submits that the presentence report has correctly determined that the applicable guideline range for the offense of conviction is 180 months. *See* Presentence Investigation Report, dated June 30, 2009, at ¶ 56. Based solely on the Guidelines, the United States further agrees that a downward departure is inappropriate but submits that a variance to 150 months is reasonable under the factors outlined in 18 U.S.C. § 3553(a).

**C.  The Defendant's provision of material support to al Qaeda warrants a sentence of 150 months imprisonment.**

Based on the various statutory factors, a sentence of 150 months reasonably and appropriately reflects the seriousness of Defendant's criminal conduct in supporting al Qaeda, the Defendant's history and characteristics, the need for deterrence and protection of the public from further crimes by Defendant, and the critical policy of avoiding disparities in sentences among similarly situated defendants.

**1.  *The nature of the offense and the characteristics of the Defendant necessitate a sentence of 150 months.***

A sentence of 150 months imprisonment appropriately takes into account the nature and circumstances of the offense and the history and characteristics of the defendant. The Defendant stands convicted of providing material support and resources (namely, "personnel" and "money") to al-Qaeda. For many years, and

certainly during the period of Defendant's criminal conduct, al Qaeda has presented one of the greatest threats to U.S. national security.   Al-Qaeda has planned and executed some of the most heinous terrorist acts in history in which thousands of innocent people have died.   These assaults, of course, include the deadliest terrorist plot ever perpetrated in the United States, the attack of September 11, 2001.

Even more essential than bombs, weapons, and money, terrorist groups need and crave individuals who believe in their causes and are willing to act under the group's direction and control.   And that is why Congress in section 2339B prohibited the provision of "personnel" to foreign terrorist groups like al Qaeda.

By choosing to offer himself to al Qaeda in a variety of ways, Warsame supplied that critical ingredient, personnel, without which no terrorist group can survive.   As described above in the factual background, Warsame first and foremost attended not one, but two, terrorist training camps designed to provide military skills to jihadists.   With these trained jihadists, Al Qaeda then could execute its grisly plots.   Warsame also worked under the direction of al Qaeda leaders by providing guard duty and English lessons. Finally, even after completing his military training, Warsame furnished a crucial service by maintaining contact with his former camp mates, passing along information about border entry and the whereabouts of fellow jihadists, and sending money to his former

19

camp commander to assist "the brothers." The decision by a senior al Qaeda leader to supply Warsame with travel money to return home paid dividends.

The Defendant's history and characteristics also make a sentence of 150 months appropriate. Apart from the current conviction, the Defendant does not have a criminal history, but the lack of criminal history points does not appropriately reflect his past acts on behalf of al-Qaeda or his future dangerousness. Although Warsame may not have been a born soldier, he overcame his physical limitations through dedication to al Qaeda's cause. Warsame found military training very challenging at the first camp he attended, but he nevertheless choose to attend a second camp where the training was even more difficult. His training involved martial arts and use of assault weapons. Even with his vision impairment, Warsame as a soldier spent time on the Taliban front line on two separate occasions. Indeed, he sought money for an eye operation to allow him to operate more effectively while in Afghanistan (as he said "especially for the kind of stuff we do there"). What other skills he possessed, he readily offered, such as teaching and translating English to jihadist medical students at the Kandahar clinic.

The Defendant's emails from Pakistan illustrate that while he was away from grueling day-to-day camp life in Afghanistan, he expressed how important this training was to him by describing it

as the best summer of his life and encouraging a friend back in Canada to join him in Afghanistan.  Further, Warsame asked his fellow jihadists to keep him posted on what was taking place inside Afghanistan so that he would not miss a chance to fight.  And finally, despite the harsh, strenuous, and dangerous  training he received and the perils of war, Warsame sought to move his wife and young daughter to Afghanistan.

**2.    *By appropriately reflecting the seriousness of providing material support to al-Qaeda, a sentence of 150 months also promotes deterrence, and imposes a reasonable and fair punishment in light of other similarly situated defendants.***

By Spring 2000, al Qaeda and Usama bin Laden were already known to engage in a violent, radical form of Islam.  As an attack against the United States, al Qaeda bombed two U.S. embassies in Africa on August 7, 1998.  Al Qaeda had issued fatwas, or Islamic legal rulings, exhorting Muslims worldwide to carry out holy war against the United States and other enemies of Islam.  Under these circumstances, the Defendant chose to leave his home and seek out jihadists' training in Afghanistan.  After another al Qaeda attack in October 2000 against the USS COLE which killed several Naval personnel, the Defendant remained in Afghanistan, working at an al Qaeda guesthouse and clinic.  Finally, even after the horrific events of September 11, 2001, the Defendant maintained his conspiratorial relationship with several jihadists he met through the al Qaeda training camps he attended.

21

To deter other individuals who may contemplate taking a similar path as the Defendant, a sentence of 150 months is necessary. *See* 18 U.S.C. § 3553(a)(2)(B); *see, e.g., United States v. Garnette,* 474 F.3d 1057, 1061 (8th Cir. 2007)(the court found an upward variance necessary to protect the public and to deter others). The Defendant's sentence must reflect a public pronouncement that attending terrorist training camps to develop military skills from an organization like al Qaeda cannot be justified as a religious pilgrimage or a "search for utopia" as Warsame claims. Unfortunately, the phenomenon of foreign terrorist camps recruiting young men from the United States and elsewhere with a radical view of Islam and a false promise of jihad or holy war still exists. To discourage and deter others from repeating Warsame's criminal choices, a significant period of incarceration is necessary.

The Defendant, however, is not entitled to a variance beyond 30 months based on the length of his pretrial detention. Cases involving international terrorism seldom involve run-of-the mill litigation. Throughout the present case, the Court has closely monitored the conditions of Mr. Warsame's pretrial detention. While the defense counsel on several occasions filed motions to pretrial release, the Court ruled in each instance that the continued detention was necessary and not punitive. Furthermore, the Court never concluded that the length of pretrial detention was

due to any dilatoriness by the government.  Instead, the length of the pretrial period stemmed from the complexity of the case, which included classified discovery, a change of defense counsel, an extended period of deliberation by the appellate court on an interlocutory appeal, and numerous motions filed by the defense.

Lengthy periods of pretrial detention, while certainly unfortunate and regrettable, are often necessary in cases involving international terrorism.  For example, Zacarias Moussaoui was detained from August 2001 through his trial and sentencing in May 2006 – a period of fifty-seven months.  Ali Saleh Al-Marri, who recently pleaded guilty in the Central District of Illinois, has been detained since his arrest in Illinois in December 2001 – a period of ninety-one months.  The presentence investigation concluded that the Defendant appears mentally fit even though he has been detained.  During the course of the Defendant's pretrial detention, moreover, the defense never appealed the numerous denials of their motions for pretrial release to the Eighth Circuit in order to secure a termination of the Defendant's pretrial detention.

Although Mr. Warsame was segregated from the general prison population for national security concerns, he was also afforded various privileges intended to mitigate any effect of prolonged detention – some privileges that other detainees at Oak Park Heights are never provided. First, he was allowed recreation seven

days a week for one hour each day.  He was allowed to take up to three of those days in the "outdoor recreation area" or the "self-contained recreation area" with windows open.  Mr. Warsame was offered more recreational opportunities than the other members of the Administrative Control Unit ("ACU").  Mr. Warsame largely chose not take either indoor or outdoor recreation.

Second, Defendant had the ability to receive psychological services as offered by Oak Park Heights.  There are daily visits by members of Oak Park Heights' psychological services to the ACU, and Mr. Warsame could request visits at any time.  The presentence investigation showed that he never asked to see a mental health counselor or psychologist, nor were there ever any suicidal concerns regarding him.  *See* Presentence Report at 46.

Third, the Defendant was allowed access to paperback books in the facility and was able to request specific publications to read. To date, other than requesting the Koran, he did not make any specific requests for publications.  Mr. Warsame was also allowed full television rights, which includes cable television channels.

Fourth, Defendant was allowed visitors and, in fact, he was visited on numerous occasions.  These visits include legal visits, visits from family, and visits from the Canadian Consulate.  During one such visit, Mr. Warsame was permitted to listen to a recording of the oral arguments in this case - brought to him at Oak Park Heights - made before the Eighth Circuit.  Such an allowance was

specially made for Mr. Warsame and is not permitted for other occupants of the ACU.  We are unaware of any potential visitors at Oak Park Heights (family, friends, etc.) who were denied access to Mr. Warsame.

Captain Steve Ayers is the highest-ranking uniformed employee of Oak Park Heights.  He was personally responsible for managing Mr. Warsame's stay there.  Captain Ayers personally visited Mr. Warsame every two to three weeks.  During their visits, Mr. Warsame never asked him for anything.  Further, Mr. Warsame's general response to Captain Ayers was "a hand waive and thumbs up."

Finally, mindful of the lengthy pretrial detention, the United States took the extraordinary step of offering the Defendant open-air walks accompanied by law enforcement agents.  This option plainly is unavailable to any other members of the ACU.  Mr. Warsame never took advantage of this privilege.  Therefore, while a lengthy pretrial detention was unfortunately necessitated by the complexity of the litigation, the Defendant's sentence should not be significantly reduced by the conditions of his pretrial confinement.

A sentence of 150 months presents a reasonable variance from the Guideline range and may reflect the specific circumstances of this case (e.g., the complex pretrial proceedings which resulted in a lengthy period of pretrial detention).  However, to promote respect for the law and avoidance of disparate sentences   for

similarly situated defendants, a variance below 150 months would be unreasonable and unwise.  In *United States v. Lindh*, for example, the defendant received twenty years for attending two training camps (including al Faruq like Warsame) and then fighting on behalf of the Taliban.  *See United States v. Lindh*, 227 F. Supp. 2d 565, (E.D. VA. 2002).

The "Lackawanna Six" case presents another very similar situation.  In that case, the defendants were charged with conspiring to provide material support to al Qaeda, based upon their pre-9/11 travel to Afghanistan to train in the Al Faruq camp operated by al Qaeda.  Five defendants pled guilty to providing material support to al Qaeda, and the sixth pled guilty to providing funds and services to al Qaeda in violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705.  Unlike Warsame, all six defendants cooperated with the Government, providing information about Al Faruq and testifying in other terrorism cases brought by the United States and by other countries.  In the end, they were sentenced, on various dates in December 2003, to terms ranging from seven to ten years in prison (10 years being the applicable statutory maximum at the time). *See United States* v. *Yahya Goba, et al.*, No. 02-CR-214S (W.D.N.Y.), *see* 240 F. Supp. 2d 242 (W.D.N.Y. 2003) (denying defendants' motions to revoke detention order).  See also *United States v. Paracha*, 03 Cr. 1197 (S.D.N.Y. 2006) (defendant sentenced to 30 years for assisting

an al Qaeda operative in obtaining a travel document to enter the United States) and *United States v. Masoud Ahmad Khan*, Crim. 03-296-A (E.D.VA), see 309 F. Supp.2d 789 (E.D. VA 2004) (defendant Khan sentenced to ten years imprisonment for attending a Laskhar-e-Taiba training camp in Pakistan and helping an LET agent buy a remote controlled plane); *United States v. Shah*, Crim. No. 05 Cr. 673 (S.D.N.Y 2007) (defendant sentenced to 15 years imprisonment for providing martial arts training to al Qaeda; the Court imposed statutory maximum, after rejecting various defense arguments for a lower sentence under the sentencing factors in 18 U.S.C. § 3553(a)).

As explained above, the nature and severity of Warsame's conduct would certainly permit the conclusion that the Guideline sentence is reasonable. But in light of all the factors in section 3553(a) and the somewhat unusual procedural history of this case, the United States has agreed to allocute for a variance of 30 months as a reasonable sentence in this case.

## Conclusion

For the foregoing reasons and those to be presented at the sentencing hearing, the Court should impose a sentence of a term of imprisonment of 150 months.

<div style="margin-left:40%">

FRANK J. MAGILL, JR.
United States Attorney

/S/ *W. Anders Folk*

BY:  W. ANDERS FOLK
    Assistant U.S. Attorney
    Attorney ID No. 311388

/S/ *Joseph N. Kaster*
_____
JOSEPH N. KASTER
Trial Attorney
National Security Division
Counterterrorism Section

</div>

28