# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 04-29 (JRT) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION ON SENTENCING** |
| MOHAMED ABDULLAH WARSAME, | |
| Defendant. | |

Joseph N. Kaster, **UNITED STATES DEPARTMENT OF JUSTICE**, Tenth and Constitution Avenue NW, Room 2649, Washington, D.C. 20530; W. Anders Folk, Assistant United States Attorney, **OFFICE OF THE UNITED STATES ATTORNEY**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Andrea K. George, Assistant Federal Public Defender, **OFFICE OF THE FEDERAL DEFENDER**, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415; David C. Thomas, **LAW OFFICES OF DAVID C. THOMAS**, 53 West Jackson Boulevard, Suite 1437, Chicago, IL 60604, for defendant.

On January 20, 2004, defendant Mohamed Abdullah Warsame ("Warsame") was indicted in the United States District Court for the District of Minnesota on a single count of providing material support to al Qaeda. After more than five years of pretrial litigation – extended by changes in Warsame's counsel, a five-count superseding indictment filed in June 2005, numerous complex and contentious pre-trial motions, issues arising out of the breadth and sensitivity of evidence implicating national security, and, most recently, a delay of approximately twenty-three months between the prosecution's notice of appeal of this Court's May 2007 suppression order and the plea that rendered that appeal moot –

17

on May 20, 2009, Warsame pled guilty to a single count of conspiring to provide material support to a designated foreign terrorist organization.  *See* 18 U.S.C. § 2339B.  On July 9, 2009, this Court sentenced Warsame to 92 months imprisonment.  This brief memorandum supplements the lengthy oral explanation for that sentence provided by the Court at Warsame's sentencing hearing.

## BACKGROUND

The facts that Warsame admitted as part of his plea agreement are available in the written plea agreement filed on May 20, 2009.  Despite the considerable speculation about Warsame's actions and intentions, no other facts in this case have been subjected to the full veracity-testing rigor of the adversarial process.  Accordingly, those facts are the touchstone for this Court's determination of the appropriate sentence in this case.  Those facts are repeated verbatim below.

> In early 2000, the defendant, who was then a resident of Toronto, Canada, decided to travel to Afghanistan and attended an Al Qaeda training camp. After traveling first to Karachi, Pakistan, the defendant then illegally crossed the border into Afghanistan by walking over a mountain pass. Thereafter, the defendant entered into an [a]l Qaeda training camp located near Kabul, Afghanistan.
>
> In the summer of 2000, at the conclusion of the first training camp, the defendant joined other fellow trainees and traveled to Kandahar, Afghanistan, where they sought admittance to an al Qaeda training camp led by Usama bin Laden.  The defendant thereafter knowingly and willfully received military training at an al Qaeda terrorist camp some distance from Kandahar.  The defendant and others met with, and attended lectures by, al Qaeda leader Usama bin Laden.  Thereafter, the defendant stayed at an al Qaeda guesthouse located in Kandahar.  The defendant provided his services to al Qaeda as a security guard and by teaching English at a medical clinic for al Qaeda associates.

> In approximately February-March 2001, the defendant sought financial assistance to bring his wife and daughter from Minneapolis, Minnesota, to join him in Afghanistan. Instead, a senior al Qaeda official directed the defendant to leave Afghanistan and return to his family. Moreover, the senior al Qaeda official authorized the payment of al Qaeda funds to pay for the defendant's return. At the time the defendant left Afghanistan, he was intending to relocate to Minneapolis, Minnesota. From March 2001 into April 2001, the defendant traveled from Afghanistan back to Toronto, Canada. Both during the course of this travel and after he returned to Toronto, the defendant established and maintained channels of communication with al Qaeda associates he had met in Afghanistan and Pakistan.
>
> In approximately June and July of 2001, the defendant solicited money from others and wired the funds to a bank account in Pakistan at the specific request of a training camp commander who the defendant knew from Afghanistan. The commander told Warsame that the money was "for the brothers." Warsame thus knew that the funds would be used to support members of al Qaeda. (The amount of money Warsame sent to the training camp commander approximated the travel funds previously provided to Warsame by Al Qaeda for him to leave Afghanistan.) In or about August 2001, for the purpose of entering the United States and while then in constant contact with known al Qaeda operatives, the defendant submitted an application for resident alien status in the United States and thereafter he entered the United States. After entering the United States, the defendant maintained communications with those al Qaeda associates he had met in Afghanistan and Pakistan. The defendant further admits that al Qaeda was at all times relevant a designated foreign terrorist organization and that the conduct described above meets the elements of a violation of Title 18, United States Code, Section 2339B.

(Plea Agreement, Docket No. 162, at 1-3.) In addition to these facts, the Court has thoroughly considered the rest of the public and non-public record in this case, which is as familiar to the Court as any previous case in its tenure.

Warsame's base offense level for this conduct is given in U.S.S.G. § 2M5.3(a), which applies to defendants who provide "material support or resources to designated foreign terrorist organizations." Warsame's base offense level under this provision is 26. While this provision includes a two-level increase for offenses involving the provision of

funds (1) "with the intent, knowledge, or reason to believe such funds would be used to purchase" dangerous weapons, firearms, or explosives"; or (2) "with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act," U.S.S.G. § 2M5.3(b)(1), the prosecution did not seek such an adjustment. The parties agreed, however, to the application of a twelve-level enhancement pursuant to U.S.S.G. § 3A1.4, which is triggered in cases involving felonies that "involved, or w[ere] intended to promote, a federal crime of terrorism." After adding these twelve levels and then reducing Warsame's offense level by three to account for his acceptance of responsibility, U.S.S.G. § 3E1.1, Warsame's total offense level was 35. Although Warsame had no criminal history predating these charges, the application of the terrorism enhancement required that his criminal history category be elevated to Category VI. U.S.S.G. § 3A1.4(b). In light of these determinations, Warsame's guidelines sentencing range was 292 to 365 months. U.S.S.G. Ch. 5, Pt. A. Because his single count of conviction carries a statutory maximum of 180 months, however, *see* 18 U.S.C. § 2339B(a)(1), 180 months became his advisory guideline sentence. *See* U.S.S.G. § 5G1.1(a).

The prosecution argued for a variance from this guideline sentence, contending that 150 months imprisonment is an appropriate punishment. Warsame contended that he should be sentenced to 67 months, or the time that he has already served in pretrial detention. In other words, both the prosecution and Warsame agreed that a sentence below the guidelines was appropriate in this case, and only disagreed as to how

substantial that variance should be. For the reasons given below, the Court concluded that a sentence of 92 months was an appropriate penalty for Warsame's crime.

## ANALYSIS

In determining the appropriate sentence in this case, the Court considered all of statutory sentencing factors listed in 18 U.S.C. § 3553(a). The Court specifically discusses the factors that weighed most heavily below.

### I. WARSAME'S CONDUCT

As the position papers filed by the parties amply demonstrate, there are many possible interpretations of the nature of Warsame's activities in Afghanistan and his reasons for returning to the West. While the Court has seen nothing in the record or the last five years of proceedings demonstrating that Warsame poses an immediate danger, he admittedly trained at two terrorist training camps, and had access to al Qaeda leadership. This background is particularly troubling in light of Warsame's continued contact with his training camp colleagues after his return to Canada and the United States. Ultimately, however, this Court's role at sentencing is not to construct the darkest possible interpretation of a defendant's conduct and potential and then sentence the defendant as if that interpretation is truth. While this Court has given its utmost consideration to all of the public and non-public information in this case – including all of the information that in any way implicates the national security of the United States – it simply finds nothing that adequately demonstrates that Warsame was a part of a specific plot against the United States, and very little that suggests he was especially

useful to al Qaeda, either during his training in the Middle East or upon his return to North America.

In short, while participation of any sort in a terrorist enterprise is a deplorable step, and is appropriately dealt with harshly under federal law, the nature of that participation will of course vary, and not every participant will merit equal punishment. That is especially important to bear in mind here, in a case involving no concrete evidence of any substantial involvement in al Qaeda's operations or of specific violent actions, and where even the prosecution has called for a significant downward variance from the guideline range. In sum, when the record is reduced to those facts that have been sufficiently proven to play a role in a sentencing in the American criminal justice system, this Court simply finds nothing to suggest that Warsame merits a sentence at the higher end of those imposed on convicted terrorists.

## II. PRIOR TERROR CASES

In considering exactly where Warsame's sentence should fall, the Court carefully considered the sentences imposed in dozens of other terror-related cases in the United States in the last eight years. Many of those cases involve unique, violent circumstances that make them unhelpful measuring sticks here. However, the Court found some guidance in the cases of Salim Hamdan, often described as the personal driver for Usama bin Laden, and the "Lackawanna Six."

Hamdan was accused of acting as bin Laden's driver; arranging for the transportation of, and then actually transporting, weapons used by al Qaeda; attending al Qaeda training camps; and receiving weapons training. *See Hamdan v. Rumsfeld*, 548

U.S. 557, 570 (2006). Despite these relatively weighty responsibilities within al Qaeda and Hamdan's close nexus with al Qaeda's leadership, a military jury sentenced him to 66 months of imprisonment, or less than the time that Warsame has already served.

Even more similar are the circumstances of the "Lackawanna Six." In that case, six defendants were accused of traveling from the United States to Pakistan, and then to an al Qaeda training camp in Afghanistan. *See United States v. Goba*, 240 F. Supp. 2d 242, 244-45 (W.D.N.Y. 2003). The defendants allegedly received firearms and tactical training, heard lectures justifying martyrdom, and attended a speech delivered by bin Laden looking ahead to a fight against Americans. *Id*. The defendants then returned to the United States, and in searches of their apartments following their arrest, authorities discovered a gun, a document justifying suicide as a form of martyrdom, and an email allegedly cryptically referring to a future terror operation. *Id*. at 256. Those defendants ultimately received sentences ranging from 84 to 120 months. While comparing the conduct of terror defendants is not an easy task in light of the secrecy surrounding many of the underlying investigations, this Court believes that these cases provide a framework for determining the appropriate sentence here, and supply considerable support for a reduction below the sentence argued for by the prosecution.

## III.   WARSAME'S CONFINEMENT

The Court has also carefully considered the difficult conditions of Warsame's confinement. While those conditions were improved on several occasions at the urging of the Court – despite Warsame's failure to challenge the restrictions with administrative complaints – they were significantly more onerous than the conditions faced by the

ordinary pretrial detainee. Accordingly, in considering the amount of time that Warsame has already served, the Court treated Warsame's difficult time in Oak Park Heights as comparable to a longer period of time served in federal prison.

## IV. CONCLUSION

After considering all of these factors, along with the additional factors listed under 18 U.S.C. § 3553(a), the Court determined that a sentence of 92 months imprisonment – with credit for the time that Warsame has already served – appropriately reflects Warsame's criminal conduct; properly aligns his sentence with those given to other similarly situated offenders; and adequately reduces his future punishment to account for the difficulty of his pretrial detention. The Court adds that it has imposed this sentence with the assumption that Warsame will receive "good time" credit for the months that he has been held awaiting trial. *See* 18 U.S.C. § 3624(b)(1). In addition, this Court has ordered that following the completion of his sentence, Warsame will be deported to Canada. (*See* Docket No. 176.)

In sum, while Warsame has not been directly involved in the types of catastrophic plots that have garnered worldwide headlines, and does not merit the type of sentence appropriate for those involved in such plots, he provided material support to an organization that has those sights in mind. That conduct merits harsh treatment under federal law, and justifies the stiff sentence imposed here.

DATED: August 24, 2009  
at Minneapolis, Minnesota.

\_\_\_\_s/ John R. Tunheim\_\_\_\_  
JOHN R. TUNHEIM  
United States District Judge